Christopher Q. Pham, SBN: 206697
        E-mail: cpham@criterioncounsel.com
Marcus F. Chaney, SBN: 245227
        E-mail: mchaney@criterioncounsel.com
Criterion Counsel, Law Corporation
6355 Topanga Canyon Boulevard, Suite 326
Woodland Hills, California 91367
Telephone: (818) 888-7540
Facsimile: (818) 888-7544

Frank Salzano, Esq. (*pro hac vice forthcoming*)
Brady Williamson, Esq. (*admitted pro hac vice*)
Salzano Ettinger Lampert & Wilson, LLP
104 West 40th Street, 14th Floor
New York, NY 10018
Telephone: (212) 375-6746
Facsimile: (646) 365-3119
fsalzano@selwlaw.com
bwilliamson@selwlaw.com

*Attorneys for Plaintiffs* Jenni Rivera Enterprises, LLC; and
The Estate Of Dolores J. Rivera

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNI RIVERA ENTERPRISES, LLC, a California limited liability company; and JAQUELIN CAMPOS, an individual, in her capacity as executrix of the ESTATE OF DOLORES J. RIVERA, the successor-in-interest to the rights of Dolores J. Rivera, professionally known as Jenni Rivera,<br><br>        Plaintiffs,<br><br>   v.<br><br>CINTAS ACUARIO, INC., a California corporation; AYANA MUSICAL, INC., a California corporation; and DOES 1 through 10, inclusive,<br><br>        Defendants. | Case No.: 2:23-cv-07847-SB-JC<br><br>**FIRST AMENDED COMPLAINT FOR DAMAGES FOR**<br><br>**COUNT 1:** Copyright Infringement<br>**COUNT 2:** Violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1114<br>**COUNT 3:** Breach of Contract<br>**COUNT 4:** Violation of California Business and Professions Code § 17200;<br>**COUNT 5:** Violation of Cal. Civ. Code § 3344.1<br>**COUNT 6:** Fraudulent Concealment<br>**COUNT 7:** Conversion<br><br>**JURY TRIAL DEMANDED** |

- 1 -

COMES NOW, Plaintiffs JENNI RIVERA ENTERPRISES, LLC ("JRE") and Jacquelin Campos, in her capacity as executrix of THE ESTATE OF DOLORES J. RIVERA (the "ESTATE")(collectively, the "PLAINTIFFS"), by and through undersigned counsel, and hereby file this Complaint against Defendants CINTAS ACUARIO, INC. ("CINTAS"); AYANA MUSICAL, INC. ("AYANA"); and DOES 1 through 10, inclusive (the "DOES")(collectively, the "DEFENDANTS"), and allege as follows:

## INTRODUCTION

1.  This matter provides a perfect illustration of the significant and lasting impact that money, power, and greed can have on a family.

2.  Since the untimely and tragic death of widely-acclaimed recording artist Dolores Janney Rivera Saavedra p/k/a Jenni Rivera ("JENNI") on December 9, 2012, her father Pedro Rivera Sr. ("PEDRO"), through his wholly owned companies CINTAS and AYANA, and upon information and belief, those companies' past and present affiliates (collectively referred to herein as "CINTAS and "AYANA"), has earned  tens of millions of dollars from the exploitation of JENNI's music, her publicity rights, and her legacy.

3.  Despite amassing a fortune from JENNI's hard work and continued popularity following her death, CINTAS and AYANA have knowingly and intentionally disregarded PLAINTIFFS' rights, as well as contractual obligations owed to PLAINTIFFS, in order to continue financially benefitting to the detriment of PLAINTIFFS, and most importantly, to the detriment of PLAINTIFFS' intended beneficiaries—JENNI's four youngest children: (i) JACQUELIN CAMPOS ("CAMPOS"); (ii) Jenika Lopez; (iii) Trinidad Marin; and (iv) Juan Lopez (collectively, the "BENEFICIARIES").

4.  After JENNI's death in December of 2012, JENNI's sister ROSIE RIVERA FLORES ("ROSIE") became the Chief Executive Officer ("CEO") of

- 2 -

JRE, the executrix of the ESTATE, and the trustee of the Dolores J. Rivera Living Trust (the "TRUST"). ROSIE held those positions from approximately December of 2012 until resigning from each of them in or around December of 2021, and shortly thereafter ROSIE became an officer, director, agent and/or representative of CINTAS and AYANA.

5.      Throughout that time, JENNI's brother JUAN RIVERA ("JUAN") was also an officer, director, agent, and/or representative of JRE, a position he resigned from in or around December of 2021, at which point JUAN also became an officer, director, agent, and/or representative of CINTAS and AYANA.

6.      From in or around December of 2012 until in or around January of 2022, the BENEFICIARIES reasonably placed their trust in members of their immediate family, and in particular PEDRO, ROSIE, and JUAN, who had previous experience in the music and entertainment business, and believed at all times that their family members were acting in their best interest, and in the best interest of PLAINTIFFS.

7.      In or around December of 2012, the BENEFICIARIES were instructed by their family members, and in particular PEDRO, ROSIE, and JUAN, to focus on building their own lives, and leave the management and control of JENNI's music and other business ventures—i.e., the management and control of JENNI's legacy––to the members of their family with knowledge of and experience in the business, who would act in their best interest to maximize earning potential for the benefit of PLANTIFFS, and ultimately the benefit of the BENEFICIARIES.

8.      Unbeknownst to the BENEFICIARIES, however, a scheme was concocted in or around December of 2012, whereby their family members would utilize their positions as officers, directors, agents, and/or representatives of CINTAS, AYANA, and JRE, with the ultimate goal of CINTAS and AYANA being enriched at PLAINTIFFS' expense. That scheme involved falsifying and doctoring

documents, and intentionally disregarding CINTAS and AYANA's failure to fulfill contractual obligations, as well as CINTAS and AYANA's claims of ownership and control of rights which rightfully belonged to PLAINTIFFS.

9. The scheme was successfully carried out and concealed from PLAINTIFFS and the BENEFICIARIES from in or around December of 2012 until in or around January of 2022 when CAMPOS replaced ROSIE as the CEO of JRE, the executrix of the ESTATE, and the trustee of the TRUST. Around the same time, the BENEFICIARIES received the results of an audit conducted on the Juan Lopez Irrevocable Trust—a subtrust of the TRUST.

10. The results of the audit, as well as other circumstances surrounding ROSIE and JUAN's departure from their positions, prompted the BENEFICIARIES to investigate further, and ultimately led to the realization that PLAINTIFFS had suffered harm as detailed herein.

11. PLAINTIFFS thereafter requested that CINTAS and AYANA cease and desist from acting in violation of agreements entered into by JENNI in the early 1990s, and further requested that CINTAS and AYANA render accounting statements and remit unpaid royalties owed to PLAINTIFFS in connection with the exploitation of JENNI's musical and other works, and her name, image, and likeness ("NIL").

12. CINTAS and AYANA have outright refused to do so, instead asserting to PLAINTIFFS, and continuing to assert to third parties, that CINTAS and AYANA own and control 100% of the rights in JENNI's musical and other works, as well as an unencumbered right to use and exploit JENNI's NIL for any purpose or in any manner, and continuing to financially benefit—to PLAINTIFFS' detriment—in connection therewith.

13. PLAINTIFFS have therefore been left with no option but to commence this civil action against the DEFENDANTS, holding each of them liable for their

unlawful acts and seeking the return of monies rightfully belonging to the PLAINTIFFS; and most importantly, have JENNI's musical works and publicity rights—the fruits of her labor and success—and the responsibility of preserving her legacy, returned to PLAINTIFFS and the BENEFICIARIES, as JENNI always intended.

### THE PARTIES

14.     Plaintiff JENNI RIVERA ENTERPRISES, LLC ("JRE") is a limited liability company, organized under the laws of the State of California, with its principal place of business located in the County of Los Angeles, California.

15.     Plaintiff JACQUELIN CAMPOS ("CAMPOS") is an individual residing in the County of Los Angeles, California, and the executrix of THE ESTATE OF DOLORES J. RIVERA (the "ESTATE"), the successor-in-interest to the rights of Dolores Janney Rivera Saavedra p/k/a Jenni Rivera ("JENNI"). CAMPOS is also the trustee of the Dolores J. Rivera Living Trust (the "TRUST"), which contains four (4) subtrusts, one for each of the BENEFICIARIES—(i) the Jacquelin Marin Irrevocable Trust; (ii) the Jenika Lopez Irrevocable Trust; (iii) the Trinidad Marin Irrevocable Trust; and (iv) the Juan Lopez Irrevocable Trust. All claims asserted by CAMPOS herein are asserted solely on behalf of the ESTATE.

16.     Plaintiff JRE is a corporate entity wholly owned and controlled by the ESTATE, and, among other things, the administrator of JENNI's rights on behalf of the ESTATE. During her lifetime, JENNI owned and controlled Jenni Rivera Enterprises, Inc., which was formed on or about January 30, 2007, and carried out virtually identical functions to those of JRE presently. Approximately nine months after JENNI's death, on or about August 21, 2013, a new entity named 3JM LLC was formed at the direction of ROSIE and/or JUAN. Jenni Rivera Enterprises, Inc. thereafter ceased operations, and was formally dissolved at ROSIE's direction on or about February 6, 2015. Approximately two weeks later, on February 23, 2015,

ROSIE executed and filed a notification with the California Secretary of State on behalf of 3JM LLC officially changing the name to Jenni Rivera Enterprises, LLC (JRE). As a result of the foregoing, all of JENNI's existing rights in her music and other works, including those she chose to assign or otherwise transfer to Jenni Rivera Enterprises, Inc. during her life, became the property of JRE, which was owned and controlled by ROSIE and JUAN from its creation until in or around January of 2022.

17.    JRE and the ESTATE are collectively referred to herein as the PLAINTIFFS.

18.    Defendant CINTAS ACUARIO, INC. ("CINTAS") is a California corporation with its principal place of business located in the County of Los Angeles, California.

19.    Defendant AYANA MUSICAL, INC. ("AYANA") is a California corporation with its principal place of business located in the County of Los Angeles, California.

20.    CINTAS and AYANA are owned and controlled by Pedro Rivera Sr. ("PEDRO"). Upon information and belief, ROSIE and JUAN are currently officers and/or directors of CINTAS and AYANA, and took on an active role in the daily management and operations of CINTAS and AYANA shortly after resigning their positions with JRE in December of 2021.

21.    Currently, PLAINTIFFS are unaware of the true and accurate names and capacities of the DOES 1 through 10, inclusive, (the "DOES"). All such unknown entities and/or individuals are hereby sued under fictitious names, however, PLAINTIFFS allege that each participated in, and contributed to, the acts, conduct, omissions, and events which proximately caused the damages to the PLAINTIFFS, as alleged herein. In the event the true and accurate names of the unknown entities and/or individuals become known, PLAINTIFFS shall seek leave to amend this Complaint.

22.     CINTAS and AYANA, together with their past and present affiliates, are collectively referred to herein as "CINTAS and AYANA"), and together with the DOES, the DEFENDANTS.

## JURISDICTION AND VENUE

23.     This is a civil action seeking, among other things, damages, declaratory relief, and injunctive relief, stemming from DEFENDANTS' copyright infringements; violations of Section 43(a) of the Lanham Act, 15 U.S.C. § 1114; and breaches of contract. As such, this action arises under the federal laws of the United States.

24.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338; 17 U.S.C. § 101 et seq. (the "Copyright Act"); and 15 U.S.C. § 1051 et seq. (the "Lanham Act"). This Court also has jurisdiction over the supplemental state law claims asserted herein under 28 U.S.C. § 1367, as all such state law claims constitute the same case and controversy as, and arise under the same nucleus of facts from, the federal law claims asserted herein, permitting this Court, as a matter of convenience and fairness, to maintain supplemental jurisdiction over said claims.

25.     This Court has personal jurisdiction over the DEFENDANTS, and venue is proper in this judicial district under 1391(b)(1), because each of the DEFENDANTS has its principal place of business and/or transacts substantial business in the State of California and in this judicial district, and the harm suffered by PLAINTIFFS, as alleged herein, occurred in the State of California and in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

### I.   The Lifetime, Achievements, and Legacy of Jenni Rivera

26.     JENNI rose to superstardom in the 1990s and 2000s as an American singer and songwriter of Regional Mexican and Latin Pop music, and broke

countless barriers by performing and innovating the historical genres of Banda, Mariachi, and Norteño.

27.    JENNI is widely regarded as one of the most influential Latin recording artists of all time, and having sold over twenty million records worldwide, is the highest-earning Banda singer of all time, earning her the nickname "La Diva de la Banda."

28.    Despite her numerous accomplishments, JENNI's life was not without turmoil, and her popularity, as well as the love and admiration she continues to garner from fans worldwide to this day, is due in large part to her unabashed willingness to write, speak, and perform about the societal and relationship issues plaguing individuals from all walks of life.

29.    Among her many accolades, JENNI won two Oye! Awards, the Mexican equivalent of a Grammy Award; received nine consecutive Premio Lo Nuestro Awards, given to the Best Female Artist of Regional Mexican Music; and collected two *Billboard* Music Awards, twenty-two *Billboard* Latin Music Awards, and four (4) Latin Grammy nominations.

30.    Her album *Jenni*, released in 2008, debuted at #1 on the *Billboard* Top Latin Albums Chart, as did her album *La Misma Gran Señora,* which was released shortly after her death in 2012 and resulted in JENNI being named the top and best-selling Latin artist of 2013 by *Billboard* magazine.

31.    In 2011, JENNI was awarded a Star on the Las Vegas Walk of Stars, and in 2024 will receive a Star on the infamous Hollywood Walk of Fame.

32.    JENNI's music has been used, reproduced, and performed millions upon millions of times over the years, and has likewise been distributed in retail stores, by digital download, and on the radio, television, and internet throughout the world.

33.     In addition to the everlasting influence of her music, JENNI's greatest and most important impact came through her charitable work on behalf of the vulnerable and less fortunate.

34.     During her life, JENNI established The Jenni Rivera Love Foundation, which is currently managed by the ESTATE and provides assistance for single mothers and victims of domestic and sexual abuse.

35.     JENNI was named spokeswoman for the National Coalition Against Domestic Violence in 2010, and in honor of her devotion to charity and her community, the Los Angeles City Council officially declared August 6th to be "Jenni Rivera Day," and later opened the "Jenni Rivera Memorial Park" in her childhood home of Long Beach, California.

36.     In May of 2016, the Jenni Rivera Love Foundation partnered with New Life Beginnings—a shelter for pregnant women and their children—to create "Jenni's Refuge," a shelter in Long Beach for women and children suffering from domestic violence, and physical, emotional, and sexual abuse.

37.     The shelter was financed by the proceeds of "Jenni Vive 2015," a concert held in Long Beach on July 2, 2015, to commemorate JENNI's life and legacy.

38.     Simply put, both JENNI and her music have withstood, and will continue to withstand, the test of time.

**II.   Jenni Rivera Enters Into Her First Recording Agreement With Her Father's Record Company**

39.     JENNI first began performing music sometime in 1992 and entered into her first recording agreement with CINTAS on or about April 15, 1993 (the "1993 Recording Agreement"). *See* Exhibit A, 1993 Recording Agreement.

40.     The 1993 Recording Agreement obligated JENNI to record exclusively on behalf of CINTAS for a period of three years, and provided CINTAS with several

rights to the sound recordings and albums recorded, produced, and distributed under the 1993 Recording Agreement, including the exclusive right to register copyrights in such sound recordings and albums (and all renewals thereof), as well as the exclusive rights under 17 U.S.C. §§ 106 and 114 to, among other things, reproduce, prepare derivative works, and publicly perform the sound recordings and albums, and permit third parties to exploit the rights belonging to CINTAS. *See Id*.

41.     In consideration for JENNI's granting of the foregoing musical rights, CINTAS was obligated to render accounting statements and remit royalty payments, in an agreed-upon amount, to her on a quarterly basis, pertaining to CINTAS' use and exploitation of the musical rights, i.e., the rights in and to the sound recordings and album written, recorded, and produced by JENNI under the 1993 Recording Agreement.

42.     In addition to the musical rights granted to CINTAS pursuant to the 1993 Recording Agreement, CINTAS was also permitted to use JENNI's "likeness or other identifying characteristics … for the promotion of sales of records under this Agreement," and granted the sole right to use JENNI's "name, voice, likeness, sound, and similar characteristics for the purpose of advertising … and otherwise merchandising records" only during the term of the 1993 Recording Agreement. *See Id*.

43.     CINTAS also had a similar, yet separate, obligation to render accounting statements and remit royalty payments, in an agreed-upon amount, to JENNI on a quarterly basis, pertaining to CINTAS' use and exploitation of JENNI's NIL for merchanting purposes and otherwise. *See Id*.

44.     CINTAS' obligations to render accounting statements and remit royalty payments to JENNI in connection was never waived  by JENNI or otherwise terminated during her lifetime, and the right to receive accounting statements and royalty payments on a quarterly basis from CINTAS subsisted in favor of

PLAINTIFFS, as JENNI's successors-in-interest, following her death in December of 2012.

45.     Upon information and belief, under the 1993 Recording Agreement, JENNI recorded and CINTAS and AYANA, and/or other third parties authorized by CINTAS and AYANA, including the DOES, distributed and earned revenue from the following albums:

(a) *La Maestra*, released in 1993, and containing the following sound recordings: "Nu Vuelvo Ni De Chiste," "La Batalla," "Nada de Ti," Mil heridas," "Una Lagrima," Sueño de Amor," "La Maestra," "Como Niño Perdido," and "Pa Nada Me Sirves";

(b) *Por Un Amor,* released in 1994, and containing the following sound recordings: "Por Un Amor," "Esperando Que Me Quieras," "Collar de Penas," "Tengo Miedo," "Soy Madre Soltera," "Trono Caido," "Estados Que Quier," "El Viejo y Yo," "Una Estrella Lejana," "Marisela y Chalino," "Viejo Vaquetón," and "Así Soy Yo";

(c) *Adiós a Selena*, released in 1995, and containing the following sound recordings: "Recuerdos de Selena," "El Columpio," "La Novia del Piebe," "Para un Gran Señor," "Los Ojales," "Son Habladas," "Adiós a Selena," "Ni Cura Ni Juez," "Los que Roban Dinero," "Vida de Perro," "Los dos amantes," and "Que Te Vaya Bonito"; and

(d) *La Chacalosa*, released in 1995, and containing the following sound recordings: "La Chacalosa," "También Las Mujeres

- 11 -

Pueden," "Libro Abierto," "Cruz de Madera," "Embárgame a Mi," "Por Una Rencilla Vieja," "Si Tu Pensabas," "La Perra Contrabandista," "Cuando el Destino," "Mi Gusto Es," and "Ni Me Debe Ni Te Debo."

46.     The foregoing sound recordings and albums, along with any other singles recorded and produced by JENNI pursuant to the 1993 Recording Agreement, are collectively referred to herein as the "1993 Musical Works."

47.     CINTAS and AYANA, and upon information and belief, the other DEFENDANTS, exploited, and continue to exploit, the 1993 Musical Works and have earned, and continue to earn, significant monies therefrom.

48.      CINTAS and AYANA, and upon information and belief, the other DEFENDANTS, have also exploited, and continue to exploit, JENNI's NIL in connection with the advertising, sale, and promotion of the 1993 Musical Works and otherwise.

49.     JENNI did not assign or otherwise transfer any rights in and to the musical compositions written and produced by JENNI under the 1993 Recording Agreement to CINTAS or AYANA through the 1993 Recording Agreement or otherwise. *See Id*.

50.     Thus, neither CINTAS, nor the other DEFENDANTS, ever lawfully obtained the right to exploit such musical compositions, or the right to permit each other or any other third parties, to exploit such musical compositions at any time. *See Id*.

51.     CINTAS and AYANA, as well as the other DEFENDANTS, have earned significant monies from their exploitation of the 1993 Musical Works, and CINTAS has repeatedly and continuously breached the terms of the 1993 Recording Agreement by, among other things, failing to render accounting statements and remit

royalty pyaments to PLAINTIFFS in connection with the such exploitation since in or around December of 2012.

52.    CINTAS and AYANA, as well as the other DEFENDANTS, have also earned significant monies from the exploitation of the musical compositions written and produced by JENNI during the term of the 1993 Recording Agreement, thereby infringing on PLAINTIFFS' rights in such musical compositions. Moreover, CINTAS has not rendered accounting statements or remitted royalty payments to PLAINTIFFS in connection with such exploitation since in or around December of 2012.

53.    In addition, CINTAS and AYANA, and the other DEFENDANTS, have earned significant monies from the exploitation of JENNI's NIL, some of which uses exceeded the scope of the rights granted to CINTAS pursuant to the 1993 Recording Agreement. As it relates to the agreed-upon right to exploit JENNI's NIL, CINTAS has repeatedly and continuously breached the 1993 Recording Agreement by failing to render accounting statements and remit royalty payments to PLAINTIFFS in connection with such exploitation since approximately December of 2012.

54.    From in or around December of 2012 until in or around January of 2022, the BENEFICIARIES reasonably placed their trust in members of their immediate family, and in particular PEDRO, ROSIE, and JUAN, who had previous experience in the music and entertainment business, and believed at all times that their family members were acting in their best interest, and in the best interest of PLAINTIFFS.

55.    In or around December of 2012, the BENEFICIARIES were instructed by their family members, and in particular PEDRO, ROSIE, and JUAN, to focus on building their own lives, and leave the management and control of JENNI's music

and other business ventures—i.e., the management and control of JENNI's legacy––to the members of their family with knowledge of and experience in the business, who would act in their best interest to maximize earning potential for the benefit of PLANTIFFS, and ultimately the benefit of the BENEFICIARIES.

56.     Unbeknownst to the BENEFICIARIES, however, a scheme was concocted in or around December of 2012, whereby their family members would utilize their positions as officers, directors, agents, and/or representatives of CINTAS, AYANA, and JRE, with the ultimate goal of CINTAS and AYANA being enriched at PLAINTIFFS' expense. That scheme involved falsifying and doctoring documents, and intentionally disregarding CINTAS and AYANA's failure to fulfill contractual obligations, as well as CINTAS and AYANA's claims of ownership and control of rights which rightfully belonged to PLAINTIFFS.

57.     The scheme was successfully carried out and concealed from PLAINTIFFS and the BENEFICIARIES from in or around December of 2012 until in or around January of 2022 when CAMPOS replaced ROSIE as the CEO of JRE, the executrix of the ESTATE, and the trustee of the TRUST. Around the same time, the BENEFICIARIES received the results of an audit conducted on the Juan Lopez Irrevocable Trust—a subtrust of the TRUST.

58.     The results of the audit, as well as other circumstances surrounding ROSIE and JUAN's departure from their positions, prompted the BENEFICIARIES to investigate further, and ultimately led to the realization that PLAINTIFFS had suffered harm as detailed herein.

59.     PLAINTIFFS thereafter notified CINTAS in writing of its failure to fulfill the explicit obligations set forth in the 1993 Recording Agreements, including its failure to render accounting statements and remit royalty payments owed to PLAINTIFFS since approximately December of 2012, and further, notified CINTAS of its other infringements of PLAINTIFFS' copyrights and trademarks.

60. CINTAS did not cure any of the above failures, indicate that it intended to do so, or otherwise acknowledge PLAINTIFFS' rights in any way.

61. Upon information and belief, CINTAS and AYANA, and the other DEFENDANTS have earned tens of millions from the wrongful acts outlined herein, and have used, transferred, and/or retained significant monies which rightfully belong to PLAINTIFFS.

**III. Jenni Rivera Enters Into Two Subsequent Recording Agreements With Cintas**

62. On or about September 1, 1995, JENNI entered into a second exclusive recording agreement with CINTAS (the "1995 Recording Agreement"). *See* Exhibit B, 1995 Recording Agreement.

63. The initial term of the 1995 Recording Agreement commenced on September 1, 1995, and expired, according to the agreement's terms, ten months following delivery by JENNI of the first master, i.e., original sound recording, owed by her under the 1995 Recording Agreement. *See Id.*

64. The 1995 Recording Agreement also granted CINTAS six separate and consecutive options to extend the term, with each extending the term until the later of one year from commencement of each such option period, or ten months after JENNI's delivery of the first master to be delivered during such option period. *See Id.*

65. During the initial term, and option periods two through five, JENNI was obligated to provide CINTAS with enough masters to constitute an album. *See Id.*

66. In consideration for JENNI's granting of the foregoing musical rights, CINTAS was obligated to render accounting statements and remit royalty payments, in an agreed-upon amount, to her on a semi-annual basis, pertaining to CINTAS' use and exploitation of the musical rights, i.e., the rights in and to the sound recordings

and album written, recorded, and produced by JENNI under the 1995 Recording Agreement. *See Id.*

67.    In addition to the musical rights granted to CINTAS pursuant to the 1995 Recording Agreement, CINTAS was also granted a perpetual right to use and exploit, and authorize third parties to use and exploit,  JENNI's NIL "for advertising and trade purposes in connection with records made" under the 1995 Recording Agreement, or "otherwise in connection with [CINTAS'] recording business." *See Id*. Contrary to representations made by CINTAS since approximately January of 2013, the foregoing provision did not grant CINTAS an unencumbered and perpetual right to use and exploit JENNI's NIL for any purpose or in any manner.

68.    Similar, yet separate, from its obligation to render accounting statements and remit royalty payments in connection with exploitation of JENNI's music, CINTAS also had an obligation to render accounting statements and remit royalty payments, in an agreed-upon amount, to JENNI on a semi-annual basis, in connection with CINTAS' use and exploitation of JENNI NIL for merchanting purposes and otherwise. *See Id*.

69.    CINTAS' obligations to render accounting statements and remit royalty payments to JENNI was never waived by JENNI or otherwise terminated during her lifetime, and the right to receive accounting statements and royalty payments on a semi-annual basis from CINTAS subsisted in favor of PLAINTIFFS, as JENNI's successors-in-interest, following her death in December of 2012.

70.    On or about April 21, 1996, JENNI entered into a third exclusive recording agreement with CINTAS (the "1996 Recording Agreement"). *See* Exhibit C, 1996 Recording Agreement.

71.    The initial term of the 1996 Recording Agreement commenced on April 21, 1996, and like the 1995 Recording Agreement, the initial term expired,

according to the agreement's terms, ten months following delivery by JENNI of the first master, i.e., original sound recording, owed pursuant to the 1996 Recording Agreement. *See Id*.

72. The 1996 Recording Agreement also granted CINTAS six separate and consecutive options to extend the term, with each extending the term until the later of one year from commencement of each such option period, or ten months after JENNIS's delivery of the first master to be delivered during such option period. *See Id*.

73. During the initial term, and option periods two through five, JENNI was obligated to provide CINTAS with enough masters to constitute an album. *See Id*.

74. Further, CINTAS was provided a number of rights to the sound recordings and albums recorded, produced, and distributed under the 1996 Recording Agreement, including the exclusive right to register copyrights in such sound recordings (and all renewals thereof), as well as the exclusive rights under 17 U.S.C. §§ 106 and 114 to, among other things, reproduce, prepare derivative works, and publicly perform the sound recordings, and permit third parties to exploit said rights. *See Id*.

75. In consideration for JENNI's granting of the foregoing musical rights, CINTAS was obligated to render accounting statements and remit royalty payments, in an agreed-upon amount, to her on a semi-annual basis, pertaining to CINTAS' use and exploitation of the musical rights, i.e., the rights in and to the sound recordings and album written, recorded, and produced by JENNI under the 1996 Recording Agreement. *See Id.*

76. In addition to the musical rights granted to CINTAS pursuant to the 1996 Recording Agreement, CINTAS was also granted a perpetual right to use and exploit, and authorize third parties to use and exploit, JENNI's NIL "for advertising and trade purposes in connection with records made" under the 1996 Recording

Agreement, or "otherwise in connection with [CINTAS'] recording business." *See Id*. Contrary to representations made by CINTAS since approximately January of 2013, the foregoing provision did not grant CINTAS an unencumbered and perpetual right to use and exploit JENNI's NIL for any purpose or in any manner.

77.     Similar, yet separate, from its obligation to render accounting statements and remit royalty payments in connection with exploitation of JENNI's music, CINTAS also had an obligation to render accounting statements and remit royalty payments, in an agreed-upon amount, to JENNI on a semi-annual basis, in connection with CINTAS' use and exploitation of JENNI NIL for merchandising purposes and otherwise. *See Id*.

78.     CINTAS' obligations to render accounting statements and remit royalty payments to JENNI was never waived or otherwise terminated during her lifetime, and the right to receive accounting statements and royalty payments on a semi-annual basis from CINTAS subsisted in favor of PLAINTIFFS, as JENNI's successors-in-interest, following her death in December of 2012.

79.     Upon information and belief, under the 1995 and 1996 Recording Agreement, JENNI recorded and CINTAS and AYANA, and/or other third parties authorized by CINTAS and AYANA, including the DOES, distributed and earned revenue from the following albums:

(a) *Si Quieres Verme Llorar*, released in 1999, and containing the following sound recordings: "Brinco Dieras (Con Mariachi)", "Perdonar Es Olvidar," "Llanto rojo," "Lagrimas, Sudor y Sangre" "La Puerta de Alcalá," Si Quieres Verme Llorar," Vivir Sin Tu Cariño (Without You)," Nostros," "Comon vivir sin verte (How do I Live)," "Tonto," and "Yo te agradezco";

- 18 -

(b) *Reyna de reynas*, released in 1999, and containing the following sound recordings: "Reyna de reynas," "El desquite," "El orgullo de mi padre," "Poppuri de chelo," "Los traficantes," La reyna es el rey," "La martina," "El bato gacho," "La maestra del contraband," Saludame a la tuya," and "Las cachanillas";

(c) *Que Me Entierren Con la Banda*, released in 2000, and containing the following sound recordings: "Que Me Entierren Con la Banda," "Como Tu Decidas," "Que un Rayo te la parta," "Las Malandrinas," "Son habladas," "Ni estando loca," "Mañana (Te Acordarás)," "Sinaloa Princesa Norteña," and "Rosita Alvirez";

(d) *Se Las Voy a Dar A Otro*, released in 2001, and containing the following sound recordings: "Angel Baby," "No Vas A Jugar," "Cuando Abras Los Ojos," "El Nopal," "Tristeza Pasajera," "Chicana Jalisciense," "Ni Tu Esposa, Ni Tu Amante, Ni Tu Amiga," "Se Law Voy A Dar A Otro," "Se Marchó," and "Escándalo;

(e) *Déjate amar,* released in 2001, and containing the following sound recordings: "Una Noche Me Embriague," "Dejate amar," "Mi Vida Loca (2001)," Querida Socia," "Y te me vas," "Madre Soltera," "El Ultimo Adios," "Agente de ventas," "Cuando Yo Quiera Has De Volver," and "Wasted Days and Wasted Nights";

(f) *Homenaje A Las Grandes*, released in 2003, and containing the following sound recordings: "La Papa Sin Catsup," "A Escondidas," "Por Un Amor, Cucurrucucú Paloma," "Ese hombre," "Juro Que Nunca Volvere," "La tequilera," "Ahora vengo a verte," "Hacer el amor con otro," "Homenaje a mi madre," "Where Did Our Love Go," "La Papa Sin Catsup (Versión Norteña)," "A Escondidas (Versión Norteña)," "Juro Que Nunca Volveré (Versión Norteña)," and Hacer el amor con otro (Versión Norteña)

(g) *Simplemente La Mejor*, a compilation album released in 2004, and containing the following sound recordings: "Querida Socia," "Las Malandrinas," "Cuando Abras Los Ojos," "Que Me Entierren Con La Banda," "Mi Vida Loca (2001)," "Tristeza Pasajera (Ilusión Pasajera)," "Reina De Reinas," "La Chacalosa," "Las Mismas Costumbres," "Amiga Si Lo Ves," "Simplemente La Mejor," "Las Mismas Costumbres (Versión Norteña)," Amigas Si Lo Ves (Versión Norteña)," and "Amiga Si Lo Ves (Versíon Pop);

(h) *Parrandera, Rebelde y Atrevida*, released in 2005, and containing the following sound recordings: "Parrandera, Rebelde y Atrevida," "Que Me Vas A Dar," "De Contrabando," "Brincos Dieras," "No Vas A Creer," "Imbécil," "No Me Pregunten Por Él," "Qué Se Te Olvidó," "Jefa de Jefas," "Me Siento Libre," and "Cuando Muere Una Dama"; and

- 20 -

(i) *Parrandera, Rebelde y Atrevida (Deluxe),* released in 2005, and containing the following sound recordings: "Parrandera, Rebelde y Atrevida," "Que Me Vas A Dar," "De Contrabando," "Brincos Dieras," "No Vas A Creer," "Imbécil," "No Me Pregunten Por Él," "Qué Se Te Olvidó," "Jefa de Jefas," "Me Siento Libre," and "Cuando Muere Una Dama," and "La Mentada Contestada."

80. The foregoing albums and sound recordings, along with any other singles recorded by JENNI pursuant to the 1995 and 1996 Recording Agreements, are collectively referred to herein as the "1995-1996 Musical Works."

81. CINTAS and AYANA, as well as the other DEFENDANTS, exploited, and continue to exploit, the 1995-1996 Musical Works and have earned, and continue to earn, significant monies therefrom.

82. CINTAS and AYANA, as well as the other DEFENDANTS, have also exploited, and continue to exploit, JENNI's NIL in connection with the advertising, sale, and promotion of such musical works, and otherwise.

83. JENNI did not assign or otherwise transfer any rights in and to the musical compositions written and produced by JENNI under the 1995 and 1996 Recording Agreements to CINTAS or AYANA through the 1995 and 1996 Recording Agreement or otherwise. *See* Exhibit B, *see also* Exhibit C.

84. Thus, neither CINTAS, nor the other DEFENDANTS, ever lawfully obtained the right to exploit such musical compositions, or the right to permit each other, or any other third parties, to exploit such musical compositions at any time. *See Id*.

85. Upon information and belief, the 1995 and 1996 Recording Agreements expired, according to the terms thereof, no later than August 21, 2005.

86.     Upon information and belief, aside from the 1993, 1995, and 1996 Recording Agreements, no other written agreements between JENNI and the DEFENDANTS, through which JENNI transferred rights in and to her sound recordings, musical compositions, and/or NIL, have ever existed.

87.     CINTAS and AYANA, as well as the other DEFENDANTS, have earned significant monies from their exploitation of the 1995-1996 Recording Agreement Musical Works, and CINTAS has repeatedly and continuously breached the terms of the 1995 and 1996 Recording Agreement by, among other things, failing to render accounting statements and remit royalty payments to PLAINTIFFS in connection with such exploitation since in or around December of 2012.

88.     CINTAS and AYANA, as well as the other DEFENDANTS, have also earned significant monies from the exploitation of the musical compositions written and produced by JENNI during the term of the 1995-1996 Recording Agreements, thereby infringing on PLAINTIFFS' rights in such musical compositions. Moreover, CINTAS has not rendered accounting statements or remitted royalty payments to PLAINTIFFS in connection with such exploitation since in or around December of 2012.

89.     In addition, CINTAS and AYANA, as well as the other DEFENDANTS, have earned significant monies from the exploitation of JENNI's NIL, some of which uses exceeded the scope of the rights granted to CINTAS pursuant to the 1995 and 1996 Recording Agreements. As it relates to the agreed-upon right to exploit JENNI's NIL, CINTAS has repeatedly and continuously breached the 1995 and 1996 Recording Agreements by failing to render accounting statements and remit royalty payments to PLAINTIFFS in connection with such exploitation since in or around December of 2012.

90.     From in or around December of 2012 until in or around January of 2022, the BENEFICIARIES reasonably placed their trust in members of their

immediate family, and in particular PEDRO, ROSIE, and JUAN, who had previous experience in the music and entertainment business, and believed at all times that their family members were acting in their best interest, and in the best interest of PLAINTIFFS.

91. In or around December of 2012, the BENEFICIARIES were instructed by their family members, and in particular PEDRO, ROSIE, and JUAN, to focus on building their own lives, and leave the management and control of JENNI's music and other business ventures—i.e., the management and control of JENNI's legacy––to the members of their family with knowledge of and experience in the business, who would act in their best interest to maximize earning potential for the benefit of PLANTIFFS, and ultimately the benefit of the BENEFICIARIES.

92. Unbeknownst to the BENEFICIARIES, however, a scheme was concocted in or around December of 2012, whereby their family members would utilize their positions as officers, directors, agents, and/or representatives of CINTAS, AYANA, and JRE, with the ultimate goal of CINTAS and AYANA being enriched at PLAINTIFFS' expense. That scheme involved falsifying and doctoring documents, and intentionally disregarding CINTAS and AYANA's failure to fulfill contractual obligations, as well as CINTAS and AYANA's claims of ownership and control of rights which rightfully belonged to PLAINTIFFS.

93. The scheme was successfully carried out and concealed from PLAINTIFFS and the BENEFICIARIES from in or around December of 2012 until in or around January of 2022 when CAMPOS replaced ROSIE as the CEO of JRE, the executrix of the ESTATE, and the trustee of the TRUST. Around the same time, the BENEFICIARIES received the results of an audit conducted on the Juan Lopez Irrevocable Trust—a subtrust of the TRUST.

94. The results of the audit, as well as other circumstances surrounding ROSIE and JUAN's departure from their positions, prompted the BENEFICIAIRES

to investigate further, and ultimately led to the realization that PLAINTIFFS had suffered harm as detailed herein.

95. PLAINTIFFS thereafter notified CINTAS in writing of its failure to fulfill the explicit obligations set forth in the 1995-1996 Recording Agreements, including its failure to render accounting statements and remit royalty payments owed to PLAINTIFFS since in or around December of 2012, and further, notified CINTAS of its other infringements of PLAINTIFFS' copyrights and trademarks.

96. CINTAS did not cure any of the above failures, indicate that it intended to do so, or otherwise acknowledge PLAINTIFFS' rights in any way.

97. Upon information and belief, CINTAS and AYANA, as well as the other DEFENDANTS, have earned tens of millions from the wrongful acts outlined herein, and have used, transferred, and/or retained significant monies which rightfully belong to PLAINTIFFS.

## IV. Ayana Enters Into A Recording Agreement With FONOVISA Pertaining to Jenni Rivera

98. On or about August 15, 2005, FONOVISA Records, a division of Univision Music LLC ("FONOVISA"), entered into an agreement with AYANA, through which AYANA purported to license the exclusive recording services of JENNI to FONOVISA (the "2005 Recording Agreement").[1] *See* Exhibit D, 2005 Recording Agreement.

99. In addition to purportedly transferring the exclusive recording services of JENNI to FONOVISA, AYANA also purportedly granted FONOVISA the right to use, exploit, and administer, and permit other third parties to use, exploit, and

---

[1] Upon information and belief, sometime prior to August 15, 2005, CINTAS and AYANA entered into an agreement, pursuant to which CINTAS granted AYANA certain rights CINTAS had obtained from JENNI through the 1995 and 1996 Recording Agreements.

administer, the sound recordings, albums, and other musical works delivered to FONOVISA under the 2005 Recording Agreement. *See Id.*

100.   FONOVISA was also granted the right to use, exploit, and administer, and permit other third parties to use, exploit, and administer, the rights to the sound recordings contained on the albums *Que Me Entierren Con La Banda*, *Dejate Amor*, *Se Las Voy A Dar A Otro*, and *Homenaje A Las Grandes* throughout the term of the 2005 Recording Agreement, and throughout agreed-upon exploitation and sell-off periods thereafter. *See Id.*; *see also* ¶ 74, *supra*.

101.   For clarity, AYANA purportedly granted FONOVISA the exclusive right to register copyrights in the sound recordings, albums, and other musical works recorded and produced under the 2005 Recording Agreement, and the exclusive rights under 17 U.S.C. §§ 106 and 114 to, among other things, reproduce, prepare derivative works, and publicly perform the sound recordings delivered to FONOVISA under the 2005 Recording Agreement, as well as the sound recordings contained on the albums *Que Me Entierren Con La Banda*, *Dejate Amor*, *Se Las Voy A Dar A Otro*, and *Homenaje A Las Grandes* throughout the term of the 2005 Recording Agreement, and throughout agreed-upon exploitation and sell-off periods thereafter. *See Id.*

102.   In addition, AYANA purportedly granted FONOVISA the exclusive right to permit third parties to exploit the musical works, and moreover, granted FONOVIA the separate and distinct right to exploit JENNI's NIL, including the right to manufacture and distribute merchandise bearing JENNI's NIL, in connection with the advertising, promotion, and sale of the sound recordings and albums recorded, produced, and distributed during the term of the 2005 Recording Agreement. *See Id.*

103.   FONOVISA was also granted the right to do the same in connection with the advertising, promotion, and sale of the sound recordings contained on the albums *Que Me Entierren Con La Banda*, *Dejate Amor*, *Se Las Voy A Dar A Otro*,

and *Homenaje A Las Grandes,* throughout the term of the 2005 Recording Agreement, and throughout agreed-upon exploitation and sell-off periods thereafter. *See Id*.

104.    AYANA also unlawfully granted FONOVISA the right to use and reproduce the musical compositions rightfully owned and controlled by JENNI, and to distribute and administer such musical compositions throughout the United States and Canada. *See Id*.

105.    The initial term of the 2005 Recording Agreement commenced on August 15, 2005—shortly before expiration of the 1995 and 1996 Recording Agreements—and the agreement provided FONOVISA with three separate options to extend the term for an agreed-upon length of time. *See Id*.

106.    The 2005 Recording Agreement required FONOVISA to make certain, specified payments to AYANA, with AYANA being required to make minimum yearly payments in the following amounts to JENNI: (i) $9,000.00 in the first contract year; (ii) $12,000.00 in the second contract year; and (iii) $15,000.00 in the third through seventh contract years, as well as in any succeeding contract years. *See Id*.

107.    FONOVISA exploited and administered, and upon information and belief, FONOVISA and/or the DEFENDANTS continue to exploit and administer, the sound recordings recorded and produced by JENNI during the term of the 2005 Recording Agreement, and upon information and belief, such parties continue to make payments to CINTAS and AYANA in connection with their exploitation and administration.

108.    Importantly, AYANA expressly represented to FONOVISA, within the 2005 Recording Agreement, that AYANA was legally permitted to grant the rights it purported to grant therein, including the right to use and exploit, and permit other third parties to use and exploit, musical compositions owned and controlled by

- 26 -

JENNI, and further, represented that AYANA was permitted to grant said rights to FONOVISA and would be legally able to do so throughout the  term of the 2005 Recording Agreement. *See Id*.

109.   Such representations were false and intended to mislead and induce FONOVISA into entering into the 2005 Recording Agreement, considering neither CINTAS and AYANA, nor any other third parties, including the other DEFENDANTS, were ever transferred rights in and to musical compositions written and produced by JENNI at any time, and further, upon information and belief, that JENNI's contractual relationship with CINTAS and AYANA expired no later than April 21, 2005—six days after the effective date of the 2005 Recording Agreement.

110.   Upon information and belief, the only rights CINTAS and/or AYANA were legally permitted to grant to the other DEFENDANTS, or any other third parties, after April 21, 2005, were the rights to the 1993 and 1995-1996 Musical Works, as well as the right to exploit JENNI's NIL, including the right to manufacture and distribute merchandise bearing JENNI's NIL, solely in connection with the advertising, promotion, and sale of the 1993 and 1995-1996 Musical Works.

111.   Upon information and belief, in furtherance of its scheme, AYANA, at the direction of PEDRO, forged JENNI's signature on the inducement letter provided to FONOVISA in connection with the 2005 Recording Agreement as, upon information and belief, JENNI had previously authorized CINTAS and AYANA to agree to terms on her behalf and execute specified agreements in her name, but had revoked such authorization prior to the execution of the 2005 Recording Agreement.

112.   CINTAS and AYANA, as well as the other DEFENDANTS, have earned, and continue to earn, significant monies through the exploitation of the sound recordings, musical compositions, and other musical works written, recorded, and produced under the 2005 Recording Agreement.

113.     CINTAS and AYANA, as well as the other DEFENDANTS, have also earned, and continue to earn, significant monies from their own, and FONOVISA's, exploitation of JENNI's NIL in connection the foregoing musical works and otherwise.

114.     Upon information and belief, CINTAS and AYANA, as well as the other DEFENDANTS, have earned tens of millions of dollars from the wrongful acts outlined herein, and have used, transferred, and/or retained significant monies which rightfully belong to the PLAINTIFFS.

## V.     A Concocted Scheme to Retain Control to the Detriment of Plaintiffs and Plaintiffs' Beneficiaries

115.     At the time of JENNI's death in December of 2012, the BENEFICAIRES were the following ages: (i) CAMPOS (23-years-old); (ii) Jenika Lopez (21-years-old); (iii) Trinidad Marin (15-years-old); and (iv) Juan Lopez (11-years-old).

116.     Following their mother's death, the BENEFICIARIES were young and coping with a traumatic, life-altering loss, and were instructed by their family members, and in particular PEDRO, ROSIE, and JUAN, to focus on building their own lives, and leave the management and control of JENNI's music and other business ventures—i.e., the management and control of JENNI's legacy—to the members of their family with knowledge of and experience in the business, who would act in their best interest to maximize earning potential for the benefit of PLANTIFFS, and ultimately the benefit of the BENEFICIARIES.

117.     The BENEFICIARIES reasonably placed their trust in their immediate family from in or around December of 2012 until in or around January of 2022, and believed at all times that their family members were acting in their best interest, and in the best interest of PLAINTIFFS, especially considering that from in or around December of 2012 until in or around December of 2021, their aunt ROSIE was the

CEO of JRE, the executrix of the ESTATE, and the trustee of the TRUST, and their uncle JUAN had also taken on an active role in the management and daily operations of JRE.

118.    However, in or around January of 2022, when CAMPOS became the CEO of JRE, the executrix of the ESTATE, and the trustee of the TRUST, and the BENEFICIARIES received the results of an audit conducted on the Juan Lopez Irrevocable Trust—a subtrust of the TRUST—the BENEFICIARIES first uncovered evidence that CINTAS and AYANA—through PEDRO—had concocted the foregoing scheme shortly after JENNI's death in or around December of 2012 with ROSIE and JUAN, on behalf of PLAINTIFFS, whereby CINTAS and AYANA would seize control of 100% of JENNI's rights, and would be permitted by ROSIE and JUAN to shirk its obligations to PLAINTIFFS and otherwise assert to other third parties that it owned and controlled rights which lawfully belonged to PLAINTIFFS.

119.    The scheme was intended to, and did, result in CINTAS and AYANA profiting immensely, and upon information and belief, a secret agreement was also reached in or around December of 2012 whereby ROSIE and JUAN were promised that they would assume ownership and control of CINTAS and AYANA once PEDRO eventually decided to step down.

120.    CINTAS and AYANA knew that the only individuals with authority to object to the wrongful acts being carried out as part of the scheme were the BENEFICIARIES, and that the only entities with the authority to do so were JRE and the ESTATE. Yet, due to the BENEFICIARIES' ages and lack of prior experience in the music and entertainment industry, JRE and the ESTATE were being controlled by ROSIE and JUAN, who unbeknownst to the BENEFICIARIES, were actively involved in the scheme.

121.    The only hurdle to the scheme's success was ensuring that the BENEFICIARIES were not alerted to the scheme, and CINTAS and AYANA (with

the help of JRE's CEO) actively and intentionally prevented the BENEFICIARIES from discovery any material facts pertaining to the scheme from in or around December of 2012 until in or around January of 2022.

122. During one conversation that occurred at CINTAS' headquarters in or around early 2013, JUAN expressed to ROSIE and PEDRO that the BENEFICIARIES were only stupid children who would never know enough about the music and entertainment business, or about what had actually transpired during JENNI's lifetime, to discover the scheme.

123. JUAN also stated during that conversation that the only one of the BENEFICIARIES who would ever be capable of catching on was Juan Lopez, also known as Johnny ("JOHNNY"), who was only 11 or 12 years old at the time. JUAN specifically referred to JOHNNY as a "cabrón," who the perpetrators of the scheme would have to be cautious of in the future.

124. In furtherance of the scheme, ROSIE created JRE, dissolved Jenni Rivera Enterprises, Inc., and dismissed essentially all of the former employees of Jenni Rivera Enterprises, Inc. to ensure that no individuals with allegiances to JENNI—and thus the BENEFICIARIES—remained on staff.

125. Around the same time, in or around early 2013, at the direction of PEDRO, ROSIE, and/or JUAN, an attorney named Gerald B. Weiner drafted a letter on behalf of CINTAS, AYANA, and Jenni Rivera Enterprises, Inc. (now JRE), stating, in sum and substance, that CINTAS and AYANA owned and controlled 100% of the rights in JENNI's music and other works, and had an unencumbered right to use and exploit JENNI's NIL.

126. The letter, despite containing false information, was thereafter distributed to music companies and vendors worldwide, and used by CINTAS and AYANA beginning in or around December of 2012 for purposes of inducing third

parties to enter into agreements with CINTAS and AYANA relative to JENNI's music and other works.

127.     ROSIE and JUAN knew of the letter and knew of CINTAS and AYANA's false claims from in or around December of 2012 until in or around December of 2021, however, as previously agreed as part of the scheme concocted following JENNI's death, no objection was ever made.

128.     CINTAS and AYANA also ceased rendering complete and accurate accounting statements and remitting royalty payments to PLAINTIFFS as required by the 1993, 1995, and 1996 Recording Agreements in or around December of 2012, yet for the same reasons provided above, no objection was ever made by either ROSIE and/or JUAN, as officers, directors, agents, and/or representatives of PLAINTIFFS.

129.     For the purpose of covering their tracks, in or around November of 2016, CINTAS and AYANA, at PEDRO's direction, provided an accounting statement and letter to PLAINTIFFS regarding royalties, which indicated that CINTAS and AYANA were owed approximately $35,000 from PLAINTIFFS due to certain actions allegedly taken by JENNI years prior. The accounting statement and letter were directed to JRE, and sent by Fabiola Ávalos, who worked in the royalty department for CINTAS and AYANA for almost twenty (20) years.

130.     The accounting statement and letter were fabricated and contained false information and misrepresentations, however, instead of acting in PLAINTIFFS' best interest by investigating the representations made in the accounting statement, or performing any due diligence whatsoever, ROSIE acquiesced and issued a $25,000 payment from JRE to CINTAS on or around the same day the falsified accounting statement and letter was received.

131.     Without question, CINTAS and AYANA's current officers, directors, agents, and/or representatives PEDRO, ROSIE, and JUAN concocted a scheme in

or around December of 2012, and successfully carried out that scheme and concealed it from PLAINTIFFS and the BENEFICIARIES, until in or around January of 2022 when CAMPOS became the CEO of JRE, the executrix of the ESTATE, and the trustee of the TRUST.

132.    As a result of the scheme, which consisted of falsifying and fabricating documents, and making knowingly false representations to the BENEFICIARIES and other third parties, PLAINTIFFS and the BENEFICIARIES were unable to learn of the scheme from in or around December of 2012 when it began to in or around January of 2022.

133.    To this day, CINTAS and AYANA utilize those falsified and doctored documents, and their prior false representations, to financially benefit from JENNI's success to the detriment of the PLAINTIFFS.

## VI.    The Beneficiaries Discover the Scheme

134.    In late 2021, JUAN's premonition came to fruition when JOHNNY (the "cabrón"), who was still only 20-years-old at the time, requested an audit of his trust, the Juan Lopez Irrevocable Trust—a subtrust of the TRUST.

135.    In or around January of 2022, CAMPOS became the CEO of JRE, the executrix of the ESTATE, and the trustee of the TRUST. Around this same time, the BENEFICIARIES received the results of the audit of the Juan Lopez Irrevocable Trust.

136.    The results of the audit, as well as other circumstances surrounding ROSIE and JUAN's departure from their positions, prompted the BENEFICIARIES to investigate further, and ultimately led to the realization that PLAINTIFFS had suffered harm as detailed herein.

137.    That investigation, which is ongoing, also revealed that their family members had utilized their positions as officers, directors, agents, and/or

representatives of CINTAS, AYANA, and JRE as part of a scheme concocted after JENNI's death, through which CINTAS and AYANA would be enriched at PLAINTIFFS' expense.

138.   PLAINTIFFS thereafter requested that CINTAS and AYANA cease and desist from acting in violation of agreements entered into by JENNI in the early 1990s, and further requested that CINTAS and AYANA render accounting statements and remit unpaid royalties owed to PLAINTIFFS in connection with the exploitation of JENNI's musical and other works, and her name, image, and likeness.

139.   CINTAS and AYANA have outright refused to do so, instead asserting to PLAINTIFFS, and continuing to assert to third parties, that CINTAS and AYANA own and control 100% of the rights in JENNI's musical and other works, as well as an unencumbered right to use and exploit JENNI's NIL for any purpose or in any manner, and continuing to financially benefit—to PLAINTIFFS' detriment—in connection therewith.

140.   Prior to January of 2022, neither CAMPOS nor any of the other BENEFICIARIES had obtained any information at all or reviewed any documents that would have alerted them to the fact that PLAINTIFFS were being harmed, let alone the manner and extent of that harm. All employees or representatives of JRE and the ESTATE who were aware of the scheme, such as ROSIE and JUAN, were either directly involved in the scheme or willingly turned a blind eye to it.

141.   PLAINTIFFS' investigation has also revealed that, in or around December of 2021—shortly before they formally resigned their positions with JRE––ROSIE and JUAN actively sought out third parties who maintained rights in JENNI's music and other works, and negotiated agreements with those third parties whereby the rights belonging to them would be transferred to CINTAS and AYANA, instead of JRE. Shortly thereafter, ROSIE and JUAN became officers, directors, agents, and/or representatives of CINTAS and AYANA.

142.    PLAINTIFFS initiated this lawsuit less than two (2) years from the date they first had any indication whatsoever that PLAINTIFFS were being harmed in any manner.

**VII.    Cintas and Ayana's Other Unauthorized and Illegal Acts**

143.    Except for the rights set forth above, neither CINTAS and AYANA, nor any of the other DEFENDANTS, were granted any additional rights in and to the sound recordings, musical compositions, and other works of JENNI, and further, were granted no additional rights to use and exploit JENNI's NIL.

144.    In fact, except for the rights granted to CINTAS pursuant to the 1993, 1995, and 1996 Recording Agreements, all rights in and to JENNI's sound recordings, musical compositions, other works, as well as JENNI's NIL rights, belong exclusively to PLAINTIFFS.

145.    As they were legally permitted to do, PLAINTIFFS registered copyrights in the name of JRE for a number of sound recordings, musical compositions, and other musical works written, recorded, and produced by JENNI during her lifetime, *see, e.g.,* United States Copyright Office Public Catalog of JRE Registrations, attached as Exhibit E hereto, and upon JENNI's death in 2012, the ESTATE became the lawful owner of any and all copyrights registered by JENNI during her lifetime (collectively, the "JRE Copyrighted Works").

146.    As it relates to sound recordings, musical compositions, and other musical works not registered by PLAINTIFFS with the United States Copyright Office (the "Copyright Office"), PLAINTIFFS are the sole parties with ownership and legal authority to register copyrights pertaining thereto, or to otherwise use and exploit, or permit other third parties to use and exploit, such sound recordings, musical compositions, and other works.

147.    Despite the foregoing, CINTAS and AYANA have wrongfully registered copyrights, and wrongfully permitted other third parties, including the

- 34 -

other DEFENDANTS, to register copyrights in and to sound recordings, musical compositions, and other works, and have done so without authority from JENNI and/or the PLAINTIFFS.

148.    Additionally, CINTAS and AYANA, as well as the other DEFENDANTS, have used and exploited the JRE Copyrighted Works, as well as sound recordings, musical compositions, and other musical works which PLAINTIFFS own and control, and have permitted other third parties to use and exploit such musical works, for their own financial gain and in contravention of PLAINTIFFS' ownership rights without JENNI and/or PLAINTIFFS' consent.

149.    PLAINTIFFS are also the registered owners of numerous trademarks related to JENNI, her music, and her NIL (the "JRE Registered Marks"), and thus, the only persons legally permitted to use and commercially exploit the JRE Registered Marks. *See, e.g.,* United States Patent and Trademark Office Records of JRE Registrations, attached as Exhibit F hereto.

150.    Despite the foregoing, CINTAS and AYANA, as well as the other DEFENDANTS, have used and exploited, permitted others to use and exploit, and continue to use and exploit and permit other third parties to use and exploit, the JRE Registered Marks for commercial purposes, and have earned, and continue to earn significant monies therefrom, including through the manufacture, sale, and distribution of merchandise bearing the JRE Registered Marks and JENNI's NIL.

151.    CINTAS and AYANA's, as well as the other DEFENDANTS', impermissible acts, as outlined herein, far exceed the limited rights granted to them pursuant to the 1993, 1995, and 1996 Recording Agreements, and thus, constitute copyright infringement, violations of Section 43(a) of the Lanham Act, 15 U.S.C. § 1114, and violations of Cal. Civ. Code § 3344.1, among other violations.

152.    Upon information and belief, the DEFENDANTS came to an agreement with each other, including the officers, directors, agents, and/or

- 35 -

representatives of CINTAS and AYANA (and past officers, directors, agents, and/or representatives of PLAINTIFFS) and were at all times co-conspirators acting in the course and scope of said relationship, and with each other's authority, knowledge, consent, and/or ratification, in connection with the foregoing scheme.

## VIII.   Plaintiffs' Requests for Non-Economic Remedies

### A. *Accounting and Constructive Trust*

153.   PLAINTIFFS not only require, but are entitled to, an order requiring the DEFENDANTS to provide a full accounting of all monies earned through their use and exploitation of JENNI's sound recordings, musical compositions, and other works, including the JRE Registered Copyrights, as well as monies earned from their use and exploitation of the JRE Registered Marks and the separate and distinct use and exploitation of JENNI's NIL.

154.   Without question, a significant amount of DEFENDANTS' earnings therefrom are the result of unlawful acts, including but not limited to violations of federal and California state laws, and upon information and belief, the DEFENDANTS have engaged in other unauthorized and unlawful acts and business transactions through which the DEFENDANTS have earned significant monies rightfully belonging to the PLAINTIFFS.

155.   Accordingly, PLAINTIFFS are entitled to an order requiring the DEFENDANTS to provide a full accounting to PLAINTIFFS of any and all monies earned from DEFENDANTS' use and exploitation of JENNI's sound recordings, musical compositions, and other musical works, including the JRE Registered Copyrights, as well as monies earned from their use and exploitation of the JRE Registered Marks and the separate and distinct use and exploitation of JENNI's NIL.

156.   PLAINTIFFS are also entitled to an order establishing a constructive trust on any and all funds acquired and withheld from PLAINTIFFS by the

DEFENDANTS, as PLAINTIFFS maintain an ownership and property interest in such monies.

### B. Recission

157.   JENNI entered into the 1993, 1995, and 1996 Recording Agreements with CINTAS, and JENNI's rights pursuant thereto subsisted in favor of the PLAINTIFFS following her death in December of 2012.

158.   Despite JENNI having performed all obligations owed to CINTAS in connection with the 1993, 1995, and 1996 Recording Agreements, CINTAS has repeatedly and continuously exploited the rights granted to it by way of said agreements, earning significant monies therefrom, while at the same time disregarding and outright refusing to comply with the express terms of such agreements.

159.   Specifically, CINTAS has failed to perform its own obligation to render accounting statements and remit royalty payments owed to the PLAINTIFFS pursuant to the 1993, 1995, and 1996 Agreements, since in or around December of 2012.

160.   As such, PLAINTIFFS are entitled to rescind the 1993, 1995, and 1996 Agreements, as well as all rights granted to, and by, CINTAS pursuant thereto, and further, to have such rights restored to PLAINTIFFS due to CINTAS' repeated and continuous breaches of said agreements.

### C. Declaratory Relief

161.   PLAINTIFFS seek a declaratory judgment with regard to the rights of PLAINTIFFS, relative to the rights of the DEFENDANTS, in and to JENNI's sound recordings, musical compositions, and the NIL rights which were granted to CINTAS pursuant to the 1993, 1995, and 1996 Recording Agreements, and which PLAINTIFFS' contend now rightfully belong to PLAINTIFFS as JENNI's successors-in-interest.

162.    Further, PLAINTIFFS seek a declaratory judgment regarding the rights of PLAINTIFFS, relative to the rights of the DEFENDANTS, in and to all other sound recordings, musical compositions, and other works, including the JRE Registered Copyrights, and further, a declaratory judgment regarding PLAINTIFFS' rights, relative to those of DEFENDANTS, as it relates to JENNI's NIL.

163.    Due to the DEFENDANTS' repeated and continuous wrongful acts, and utter indifference to PLAINTIFFS and their rights, PLAINTIFFS, as JENNI's successors-in-interest, are legally entitled to all such rights, and thus, seek an order declaring such.

164.    This request is permitted at this time, as the issues described herein constitute an actual case and controversy, and directly implicate the rights of both the PLAINTIFFS and DEFENDANTS, both at the present time and persisting into the future.

### D. Temporary and Permanent Injunction

165.    PLAINTIFFS seek temporary and permanent injunctive relief regarding the DEFENDANTS' rights, and an order requiring the DEFENDANTS to immediately cease and desist from engaging in the unauthorized and wrongful use and exploitations of JENNI's sound recordings, musical compositions, and other musical works, including the JRE Registered Copyrights, as well as requiring the DEFENDANTS to immediately cease and desist from the use and exploitations of the JRE Registered Marks and JENNI's NIL.

166.    The DEFENDANTS' wrongful acts include but are not limited to claiming to maintain legal ownership and control of 100% of the rights to JENNI's sound recordings, musical compositions, and other works, as well as an unencumbered right to use and exploit JENNI's NIL for any purpose or in any manner.

167.    PLAINTIFFS have set forth a clear and substantial likelihood of success on the merits of their claims against the DEFENDANTS, and have suffered, and will continue to suffer, irreparable harm, including harm to PLAINTIFFS' professional reputation and goodwill, as a result of the DEFEDANTS' unauthorized and wrongful acts, in the event such injunctive relief is not granted.

168.    Granting the injunctive relief sought by PLAINTIFFS will alleviate the ongoing harm suffered by PLAINTIFFS, which harm far outweighs any potential hardship the granting of such relief could potentially have on the DEFENDANTS, who have spent years using, transferring, and/or wrongfully withholding, significant monies rightfully belonging to PLAINTIFFS.

169.    Further, granting such relief will not adversely affect public policy or the public interest, but will instead promote justice and equity.

### CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### Copyright Infringement

### (Against all Defendants)

170.    PLAINTIFFS repeat and reallege the allegations set forth in paragraphs 1 through 169 above as if fully set forth herein.

171.    PLAINTIFFS are the rightful owners of the copyrights in the JRE Copyright Works, *see e.g.*, Exhibit E, which includes the exclusive rights under 17 U.S.C. §§ 106 and 114 to, among other things, reproduce, prepare derivative works, and publicly perform the sound recordings, musical compositions, and other works, and to permit third parties to use and exploit such rights.

172.    Therefore, PLAINTIFFS are entitled and authorized to protect such rights against copyright infringement, including that of the DEFENDANTS.

173.    The DEFENDANTS have repeatedly and continuously infringed on PLAINTIFFS' copyrights by, among other things, using, reproducing, publicly

- 39 -

performing, and permitting others to use, reproduce, and publicly perform, the JRE Copyrighted Works, and have done so without PLAINTIFFS' authorization, earning significant monies therefrom.

174.    Each and every use and exploitation of the JRE Copyrighted Works by the DEFENDANTS, as well as uses and exploitations done with the authorization of any of the DEFENDANTS, constitutes a separate and distinct act of infringement.

175.    The DEFENDANTS have acted willfully, deliberately, and with prior notification and knowledge of PLAINTIFFS' ownership rights, or at minimum, in reckless disregard of PLAINTIFFS' ownership rights.

176.    PLAINTIFFS have been damaged as a direct and proximate result of the DEFENDANTS' infringements and are therefore liable to PLAINTIFFS for willful copyright infringement under 17 U.S.C. § 501.

177.    PLAINTIFFS are entitled to receive the actual damages and profits obtained by the DEFENDANTS, pursuant to 17 U.S.C. § 504, or in the alternative, are entitled to statutory damages due to the DEFENDANTS' willful copyright infringement.

178.    As set forth above, PLAINTIFFS are also entitled to non-economic relief, including declaratory and injunctive relief, pursuant to 17 U.S.C. § 502, enjoining the DEFENDANTS from further infringements, and are entitled to an order, pursuant to 17 U.S.C. § 503, requiring any and all of DEFENDANTS' infringing products to be impounded and destroyed. PLAINTIFFS are also entitled to the establishment of a constructive trust.

179.    PLAINTIFFS are further entitled to recover their attorney's fees and costs incurred in connection with this matter, pursuant to 17 U.S.C. § 505.

## SECOND CLAIM FOR RELIEF

### Violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1114

### (Against all Defendants)

180.    PLAINTIFFS repeat and reallege the allegations set forth in paragraphs 1 through 179 above as if fully set forth herein.

181.    PLAINTIFFS are the rightful owners of the JRE Registered Marks, *see* Exhibit F, which includes the exclusive rights to use said marks, and any reproduction and imitations thereof, in commerce, such as in the sale, offering for sale, distribution, and/or advertising of goods bearing the JRE Registered Marks.

182.    The DEFENDANTS have infringed, and continue to infringe, PLAINTIFFS' ownership of the JRE Registered Marks by, among other things, selling, offering for sale, distributing, and advertising goods bearing the JRE Registered Marks, and earning significant monies therefrom.

183.    Under the circumstances presented herein, the DEFENDANTS' unauthorized use and exploitation of the JRE Registered Marks in commerce is likely to cause, and upon information already has caused, confusion or mistake, or otherwise deceived consumers and the general public as to the DEFENDANTS' rights in, and association with the JRE Registered Marks, thereby depriving PLAINTIFFS of the value, reputation, and goodwill inherent in such marks.

184.    As a direct and proximate result, PLAINTIFFS are entitled to recover actual damages caused by the DEFENDANTS' violations of Section 43(a) of the Lanham Act, 15 U.S.C. § 1114, as well as all other remedies provided for in 15 U.S.C. §§ 1114 and 1116 through 1118, which includes but is not limited to the disgorgement of the DEFENDANTS' profits earned through such violations.

185.    The DEFENDANTS acted willfully, deliberately, and with prior notification and knowledge of PLAINTIFFS' ownership of the JRE Registered Marks, or at minimum, in reckless disregard of PLAINTIFFS' ownership rights,

entitling PLAINTIFFS, pursuant to 17 U.S.C. § 1117, to recover treble damages and its attorney's fees and costs in connection with this matter.

186.   As set forth above, PLAINTIFFS are also entitled to non-economic relief, including declaratory and injunctive relief enjoining the DEFENDANTS from continued violations, and an order requiring any and all of the DEFENDANTS' violating products to be impounded and destroyed, and further, PLAINTIFFS are entitled to the establishment of a constructive trust.

### THIRD CLAIM FOR RELIEF

### Breach of Contract

### (Against all Defendants)

187.   PLAINTIFFS repeat and reallege the allegations set forth in paragraphs 1 through 186 above as if fully set forth herein.

188.   JENNI and CINTAS entered into the 1993, 1995, and 1996 Recording Agreements; three valid contractual agreements.

189.   Pursuant to the agreements, JENNI was obligated to provide CINTAS with a specified number of sounds recording and albums, an obligation JENNI fulfilled.

190.   Despite such, and despite CINTAS earning significant monies from the 1993, 1995, and 1996 Musical Works, CINTAS materially breached the terms of the 1993, 1995, and 1996 Recording Agreements by repeatedly and continuously failing to render accounting statements and remit royalty payments owed to PLAINTIFFS (as JENNI's successors-in-interest) in connection with CINTAS' use and exploitation of the 1993, 1995, and 1996 Musical Works, since in or around December of 2012.

191.   In addition, CINTAS has earned significant monies from the use and exploitations of JENNI's NIL in connection with the advertising, promotion, and sale of merchandise bearing JENNI's NIL, and have committed a separate and

distinct breach the above-referenced agreements by repeatedly and continuously failing to render accounting statements and remit royalty payments to PLAINTIFFS (as JENNI's successors-in-interest) in connection therewith, since in or around December of 2012.

192. As a direct and proximate result of CINTAS' breaches, PLAINTIFFS have been damaged in an amount to be determined at trial.

193. Further, as a result of the foregoing acts, PLAINTIFFS are entitled to rescind the 1993, 1995, and 1996 Agreements, as well as the rights granted to, and by, CINTAS pursuant thereto, and have such rights restored to PLAINTIFFS.

194. PLAINTIFFS are also entitled to a full accounting of monies earned by CINTAS, and the establishment of a constructive trust, as outlined above.

## FOURTH CLAIM FOR RELIEF

### Violation of California Business and Professions Code § 17200 et seq.

### (Against all Defendants)

195. PLAINTIFFS repeat and reallege the allegations set forth in paragraphs 1 through 194 above as if fully set forth herein.

196. As outlined herein, the DEFENDANTS, individually and collectively, engaged in unlawful, unfair, and/or fraudulent business practices by, among other things, claiming to own and control 100% of the rights in and to JENNI's sound recordings, musical compositions, and other works, as well as an unencumbered right to use and exploit JENNI's NIL for any purpose or in any manner.

197. The DEFENDANTS were aware, at all times, such rights rightfully belonged to the PLAINTIFFS, and in furtherance of their scheme to harm PLAINTIFFS, falsified documents and concealed material facts regarding their wrongdoing, as set forth above.

198. The DEFENDANTS disregarded, and showed a reckless indifference, to PLAINTIFFS and their rights for the purpose, and with the intention, of

misleading, creating confusion, and otherwise deceiving consumers and the public as to the DEFENDANTS' rights.

199. The DEFENDANTS have therefore committed unfair business practices in violation of California Business and Professions Code § 17200 et seq., and in doing so, have caused and continue to cause damages to PLAINTIFFS in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF

### Violation of California Civil Code § 3344.1

### (Against all Defendants)

200. PLAINTIFFS repeat and reallege the allegations set forth in paragraphs 1 through 199 above as if fully set forth herein.

201. California Civil Code § 3344.1 provides that:

> Any person who uses a deceased personality's name, voice, signature, photograph, or likeness, in any manner, on or in products, merchandise, or goods, or for purposes of advertising or selling, or soliciting purchases of, products, merchandise, goods, or services, without the requisite consent shall be liable for any damages sustained by the person or persons injured as a result thereof.

*See* Cal. Civ. Code § 3344.1

202. Since JENNI's death in December of 2012, the DEFENDANTS have used and exploited JENNI's NIL for commercial purposes, including through the advertising, promotion, and sale of merchandise bearing JENNI's NIL, and have earned significant monies therefrom.

203. Despite CINTAS being granted a limited right to use JENNI's NIL in connection with the advertising, promotion, and sale of the 1993, 1995, and 1996 Musical Works, the DEFENDANTS have used and exploited JENNI's NIL far in

- 44 -

excess of the limited rights to which they were granted, and have done and continue to do so without authority from PLAINTIFFS, who, as JENNI's successors-in-interest, are the only persons legally entitled to provide such consent.

204.    As a direct and proximate result, PLAINTIFFS have been damaged, and are therefore entitled to recover the actual damages suffered by them, as well as any profits earned by the DEFENDANTS as a result of such unauthorized uses of JENNI's NIL.

205.    Moreover, PLAINTIFFS are entitled to punitive damages, as well as PLAINTIFFS' attorney's fees and costs in connection with this matter.

**SIXTH CLAIM FOR RELIEF**

**Fraudulent Concealment**

**(Against all Defendants)**

206.    PLAINTIFFS repeat and reallege the allegations set forth in paragraphs 1 through 205 above as if fully set forth herein.

207.    The DEFENDANTS have repeatedly and continuously concealed and/or failed to disclose material facts to third parties relating to their ownership and control of rights to JENNI's sound recordings, musical compositions, other musical works, as well as JENNI's NIL, and further, concealed and/or failed to disclose material facts to PLAINTIFFS relating to DEFENDANTS' earnings from their use and exploitations of JENNI's sound recordings, musical compositions, other musical works, and NIL.

208.    For example, in or around early 2013, at the direction of PEDRO, ROSIE, and/or JUAN, an attorney named Gerald B. Weiner drafted a letter on behalf of CINTAS, AYANA, and Jenni Rivera Enterprises, Inc. (now JRE), stating, in sum and substance, that CINTAS and AYANA owned and controlled 100% of the rights in JENNI's music and other works, and had an unencumbered right to use and exploit JENNI's NIL.

209.    The letter, despite containing false information, was thereafter distributed to music companies and vendors worldwide, and used by CINTAS and AYANA beginning in or around December of 2012 for purposes of inducing third parties to enter into agreements with CINTAS and AYANA relative to JENNI's music and other works.

210.    ROSIE and JUAN knew of the letter and knew of CINTAS and AYANA's false claims from in or around December of 2012 until in or around December of 2021, however, as previously agreed as part of the scheme concocted following JENNI's death, no objection was ever made.

211.    As another example, CINTAS and AYANA, at PEDRO's direction, rendered false and doctored accounting statements to PLAINTIFFS, including one in November of 2016, which falsely claimed that CINTAS and AYANA were entitled to approximately $35,000 in royalties from JRE, as a result of certain actions taken by JENNI during her lifetime.

212.    The accounting statement and its accompanying letter were directed to JRE, and sent by Fabiola Ávalos, who worked in the royalty department for CINTAS and AYANA for almost twenty (20) years.

213.    The accounting statement and letter were fabricated and contained false information and misrepresentations, however, instead of acting in PLAINTIFFS' best interest by investigating the representations made in the accounting statement, or performing any due diligence whatsoever, ROSIE acquiesced and issued a $25,000 payment from JRE to CINTAS on or around the same day the falsified accounting statement and letter was received.

214.    The DEFENDANTS, at all times, had a duty to disclose, and to otherwise not conceal, the above material facts from PLAINTIFFS and other third parties, yet knowingly failed to do so for purposes, and with the intention, of defrauding PLAINTIFFS and other third parties for their own financial benefit.

215.   Had such material facts been disclosed by DEFENDANTS, and/or otherwise not concealed, other third parties would not have entered into agreements with the DEFENDANTS pertaining to said rights and paid monies to DEFENDANTS pursuant to said agreements, and/or would have otherwise acted in a manner different than that in which they did act.

216.   And, had such material facts been disclosed to and/or not concealed from, PLAINTIFFS, aside from ROSIE and JUAN who shirked their obligations as officers, directors, agents, and/or representatives of PLAINTIFFS in furtherance of the scheme outlined herein, PLAINTIFFS would have likewise acted in manner far different than PLAINTIFFS have acted thus far, including acting to protect their rights prior to now.

217.   As a direct and proximate result of DEFENDANTS' fraudulent concealment of material facts, as outlined herein, PLAINTIFFS have been damaged in an amount to be determined at trial, and DEFENDANTS are liable to PLAINTIFFS for treble damages, as well as PLAINTIFFS' attorney's fees and costs in connection with this matter.

## SEVENTH CLAIM FOR RELIEF

### Conversion

### (Against all Defendants)

218.   PLAINTIFFS repeat and reallege the allegations set forth in paragraphs 1 through 217 above as if fully set forth herein.

219.   PLAINTIFFS are the sole and rightful owner of all rights, title, and interest in and to JENNI's NIL, except as expressly set forth in the 1993, 1995, and 1996 Recording Agreements, as well as all proceeds stemming therefrom.

220.   In contravention of PLAINTIFFS' rights, DEFENDANTS took possession of, and have used for their own personal and financial benefit, and/or wrongfully transferred or retained, significant monies from the exploitation of

- 47 -

JENNI's NIL, including through the advertisement and distribution of merchandise bearing JENNI's NIL, since in or around December of 2012.

221.    As a direct and proximate result of DEFENDANTS' use and/or wrongful transfer and retainment of such monies, PLAINTIFFS have been damaged in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, PLAINTIFFS pray for relief as set forth below:

1.    Compensatory and general damages in an amount to be determined  at trial;

2.    Actual damages and profits, or in the alternative, statutory damages;

3.    For damages in an amount to be proven at trial for unjust enrichment;

4.    Punitive and exemplary damages;

5.    Prejudgment interest as provided by law;

6.    Interest upon any judgment entered as provided by law;

7.    Attorney's fees and costs as provided by law;

8.    Rescission of the 1993, 1995, and 1996 Recording Agreements, and all rights granted to, or by, CINTAS pursuant thereto;

9.    A full accounting and restitution;

10.    Injunctive and declaratory relief;

11.    Establishment of a constructive trust; and

12.    Such other and further relief as this Court deems necessary and proper.

1

**<u>DEMAND FOR JURY TRIAL</u>**

2

Plaintiffs hereby demand a jury trial pursuant Rule 38 of the Federal Rules of

3

Civil Procedure and Local Rule 38-1.

4

5

Dated:  December 22, 2023          CRITERION COUNSEL, LAW CORPORATION

6

By:  ___/s/_ Christopher Q. Pham_____

7

Christopher Q. Pham, Esq.

8

*Attorneys for Plaintiffs*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PROOF OF SERVICE**

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is, 6355 Topanga Canyon Blvd., Suite 326, Woodland Hills, California 91367. On, December 22, 2023, I served the within document(s):

FIRST AMENDED COMPLAINT FOR DAMAGES

☐    FACSIMILE - by transmitting via facsimile the document(s) listed above to the fax number(s) set forth on the attached Telecommunications Cover Page(s) on this date before 5:00 p.m.

☐    MAIL - by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Woodland Hills, California addressed as set forth below.

☐    OVERNIGHT COURIER - by placing the document(s) listed above in a sealed envelope with shipping prepaid and depositing in a collection box for next day delivery to the person(s) at the address(es) set forth below via UNITED PARCEL SERVICE.

☒    ELECTRONIC DELIVERY – by causing such document(s) to be transmitted by electronic mail transmission to the appropriate electronic mail address(es) set forth below.

☐    PERSONAL SERVICE - by personally delivering the document(s) listed above to the person(s) at the address(es) set forth below.

John M. Begakis, Esq.
ALTVIEW LAW GROUP, LLP
12100 Wilshire Blvd., Suite 800
Los Angeles, CA 90025
john@altviewlawgroup.com

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business, unless otherwise set forth herein. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made. Executed on December 22, 2023, at Woodland Hills, California.

Catherine Brannan