1  John M. Begakis, Esq. (SBN 278681)
   john@altviewlawgroup.com
2  **ALTVIEW LAW GROUP, LLP**
   9454 Wilshire Blvd., Suite 825
3  Beverly Hills, California 90025
   Telephone: (310) 230-5580
4  Facsimile: (562) 275-8954

5  *Attorneys for Defendants* CINTAS ACUARIO,
   INC., a California corporation, and AYANA
6  MUSICAL, INC., a California corporation

7

8              UNITED STATES DISTRICT COURT

9         FOR THE CENTRAL DISTRICT OF CALIFORNIA

10  JENNI RIVERA ENTERPRISES, LLC, a          CASE NO: 2:23-cv-07847-SB-JC
    California limited liability company; and
11  JAQUELIN CAMPOS, an individual, in        **JOINT BRIEF FOR**
    her capacity as executrix of the ESTATE   **DEFENDANTS' MOTION FOR**
12  OF DOLORES J. RIVERA, the                  **SUMMARY JUDGMENT, OR IN**
    successor-in-interest to the rights of     **THE ALTERNATIVE, SUMMARY**
13  Dolores J. Rivera, professionally known    **ADJUDICATION;**
    as Jenni Rivera,                           **MEMORANDUM OF POINTS**
14                                             **AND AUTHORITIES IN SUPPORT**
                 Plaintiff,                    **THEREOF**
15
          v.                                   [*Joint Appendix of Facts; Joint*
16                                             *Appendix of Evidence; Joint Appendix*
    CINTAS ACUARIO, INC., a California         *of Objections; Declarations; and*
17  corporation; AYANA MUSICAL, INC., a        *[Proposed] Orders Filed Concurrently*
    California corporation; and DOES 1 through *Herewith*]
18  10, inclusive,
                                               **Hearing**
19               Defendants.                   Date: October 25, 2024
                                               Time: 8:30 a.m.
20  CINTAS ACUARIO, INC., a California         Dept: Courtroom 6C
    corporation; AYANA MUSICAL, INC., a               350 W. 1st Street
21  California corporation,                            Los Angeles, CA 90012
                                               Judge: Hon. Stanley Blumenfeld, Jr.
22               Counterclaimants,
                                               Action Filed: September 20, 2023
23        v.                                   Trial Date: February 11, 2025

24  JENNI RIVERA ENTERPRISES, LLC, a
    California limited liability company;
25  JANNEY MARIN RIVERA, an
    individual; JACQUELIN CAMPOS, an
26  individual and trustee of THE DOLORES
    J. RIVERA LIVING TRUST; JENIKA
27  LOPEZ, an individual; TRINIDAD
    MARIN, an individual; JUAN LOPEZ, an
28  individual, and ROES 1-25, inclusive

                 Counterdefendants.

────────────────────────────────────────────

        DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** on October 25, 2024[1] at 8:30 a.m., or as soon thereafter as the matter may be heard before the Honorable Stanley Blumenfeld, Jr., in Courtroom 6C of the First Street Courthouse, located at 350 West 1st Street, Los Angeles, CA 90012, Defendants CINTAS ACUARIO, INC., a California corporation and AYANA MUSICAL, INC., a California corporation (collectively, "Defendants") will and hereby do move, pursuant to Federal Rule of Civil Procedure ("FRCP") 56, for summary judgment, or, in the alternative, summary adjudication (the "Motion") as to the First Amended Complaint (the "FAC") filed on December 22, 2023 by Plaintiffs JENNI RIVERA ENTERPRISES, LLC, a California limited liability company, and JAQUELIN CAMPOS, an individual, in her capacity as executrix of the ESTATE OF DOLORES J. RIVERA, the successor-in-interest to the rights of Dolores J. Rivera, professionally known as Jenni Rivera (collectively, "Plaintiffs"), for the foregoing reasons:

1. Each of Plaintiffs' claims is time-barred;

2. Each of Plaintiffs' claims is barred by the doctrine of laches;

3. Each of Plaintiffs' claims independently fails because either Plaintiffs cannot establish Defendants' infringement of any rights, or Plaintiffs do not possess the facts necessary to support each claim; and

4. Plaintiffs' claim for recission of the Recording Agreements fails because Plaintiffs have unreasonably delayed in asserting it, and such a remedy would not be commensurate with the gravity of any potential breach that actually occurred.

///

///

---

1 At the time the parties met and conferred the first week of September, in anticipation of filing this Motion, as required by the Court's Order re Motions for Summary Judgment, the Court's website did not reflect that October 25, 2024 (as well as October 11 and October 18) would be a closed hearing date. Accordingly, Defendants humbly request that the Court either advance or continue the hearing of this Motion to an open hearing date that is most convenient for the Court.

MOTION FOR SUMMARY JUDGMENT

1  The Motion is made following the parties' good faith compliance with the
2  meet and confer and filing requirements of the Court's Order re: Motions for
3  Summary Judgment. *See* Declaration of John Begakis ("Begakis Decl.") at ¶ 9.

4  The Motion is based on this Notice of Motion, the Memorandum of Points
5  and Authorities and Declarations of Pedro Rivera, Rosie Rivera, Juan Rivera, and
6  John Begakis, Esq. filed concurrently herewith, all pleadings, files and records on
7  file in these proceedings, all matters of which the Court may take judicial notice,
8  and any argument or evidence that may be presented to or considered by the Court
9  prior to its ruling hereon.

10

11  DATED:  September 27, 2024          **ALTVIEW LAW GROUP, LLP**

12

13                                    By:  ____/s/ John M. Begakis_____
14                                         JOHN M. BEGAKIS
                                          *Attorneys for Defendants*
15                                         CINTAS ACUARIO, INC., a California
                                          corporation; and AYANA MUSIC, INC., a
16                                         California corporation

17

18

19

20

21

22

23

24

25

26

27

28

MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

I.    DEFENDANTS' INTRODUCTION ................................................................ 1

II.   PLAINTIFFS' INTRODUCTION ................................................................ 2

III.  DEFENDANTS' RELEVANT FACTUAL ALLEGATIONS ...................... 3

      A.    The Recording Agreements ................................................... 3

      B.    The Formation of Plaintiffs ................................................... 4

      C.    Rosie's Operation of Jenni's Business ................................. 4

      D.    Cintas' Accounting To JRE And Discovery Of Overpayments ............. 6

      E.    The Audit And Rosie's Resignation ...................................... 7

IV.   LEGAL STANDARD ................................................................................. 8

V.    DEFENDANTS' ARGUMENT ................................................................. 9

      A.    Each Of Plaintiffs' Claims Is Time-Barred ......................... 9

            1.    One or More Of Plaintiffs' Claims Are Barred By The Contractual Limitations Periods In The Recording Agreements ......... 9

            2.    All Of Plaintiffs' Claims Are Barred By Applicable, Statutorily-Imposed Limitations Periods ................................. 10

            3.    The Tolling Doctrine Should Not Be Applied Because There Was No Fraudulent Concealment ....................... 11

      B.    Each Of Plaintiffs' Claims Are Barred By The Doctrine of Laches ......... 13

            1.    Plaintiffs' Delay Was Unreasonable ......................... 13

            2.    Plaintiffs' Delay Has Prejudiced Defendants............ 14

      C.    Plaintiffs' First Claim For Relief Fails Because Plaintiffs Cannot Show Ownership Of The Relevant Rights Or Infringement Thereof ........... 15

      D.    Plaintiffs' Second Claim For Relief Fails Because Cintas Owns Jenni's Applicable NIL Rights Via The Recording Agreements ......... 15

      E.    Plaintiffs' Third Claim For Relief Fails Because Defendants Have Not Breached The Recording Agreements ......................... 16

      F.    Plaintiffs' Fourth Claim For Relief Fails Because Plaintiffs' First, Second And Fifth Causes of Action Fail................... 16

iv

G.  Plaintiffs' Fifth Claim For Relief Fails Because Cintas Owned Jenni's Applicable NIL Rights Via The Recording Agreements ........ 17

H.  Plaintiffs' Sixth Claim For Relief Fails Because No Facts Exist to Establish Fraudulent Concealment ..................................................... 17

I.  Plaintiffs' Seventh Claim For Relief Fails Because No Facts Exist to Establish Conversion ................................................................. 17

J.  Plaintiffs' Claim For Recission Of The Recording Agreements And All Of Defendants' Rights Therein Cannot Be Established ........ 18

VI.  PLAINTIFFS' ARGUMENT .......................................................................... 19

A.  The Relevant Limitations Periods ........................................................ 21

B.  The Running Of The Statute Of Limitation On Plaintiffs' Claims Should Be Tolled .................................................................................... 23

1.  Discovery of the Fraud ............................................................... 25

2.  Circumstances under which the Fraud was Discovered ............. 26

3.  There Were No Lack of Fault for Failure to Discover and No Actual or Presumptive Knowledge to Put Plaintiffs on Inquiry ......................................................................................... 29

4.  The Guidance Provided by Prior Rulings on Fraudulent Concealment Shows That Plaintiffs Had No Reasonable Notice ........................................................................................... 33

C.  The Contractual Limitations Periods In The Recording Agreements Are Not Dispositive of Plaintiffs' Claims ......................... 34

D.  Defendants Provide Insufficient Undisputed Facts for this Court to Extinguish Plaintiffs' Claims on their Laches Affirmative Defense ................................................................................................... 35

E.  Defendants Have Failed to Negate any Specific Element of Plaintiffs' Claims or the Remedy of Recission ..................................... 38

1.  Copyright Infringement .............................................................. 38

2.  Trademark Infringement ............................................................. 39

3.  Breach of Contract ..................................................................... 42

4.  Cal. Bus. & Prof. Code § 17200 ................................................ 43

5.  Cal. Civ. Code § 3344.1 ............................................................. 43

6.  Fraudulent Concealment ............................................................ 43

7.  Conversion .................................................................................. 44

8.  Rescission ................................................................................... 44

v

VII.   DEFENDANTS' CONCLUSION ................................................................... 45

VIII.  PLAINTIFFS' CONCLUSION .................................................................... 45

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MOTION FOR SUMMARY JUDGMENT

# **TABLE OF AUTHORITIES**

## **CASES**

*Linear Tech. Corp. v. Applied Materials, Inc.*, 152 Cal.App.4th 115 (2007)...................16

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)...........................................8, 12, 24

*Arellano v. McDonough*, 598 U.S. 1 (2023).............................................................11

*Ball v. Posey* 176 Cal.App.3d 1209 (1986) ......................................................28, 44

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ..................................................8, 9

*Cel-Tec Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999)
  20 Cal.4th 163 .........................................................................................17

*Citicorp Real Estate, Inc. v. Smith*, 155 F.3d 1097 (9th Cir. 1998)...................18

*City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 68
  Cal.App.4th 445 (1998)........................................................................26, 31

*City of Davis v. Coleman*, 521 F.2d 661 (9th Cir. 1975)................................35

*Conerly v. Westinghouse Elec. Corp.*, 623 F. 2d 117 (9th Cir. 1980) .............25

*Conmar Corp. v. Mitsui & Co. (U.S.A), Inc.*, 858 F.2d 499 (9th Cir. 1988)..............25, 33

*Crofoot Lumber, Inc. v. Thompson*, 163 Cal. App. 2d 324 (1958)...................18

*Deirmenjian v. Deutsche Bank, A.G.*, No. CV 06-00774 MMM CWX, 2006
  WL 4749756 (C.D. Cal. Sept. 25, 2006).............................................17

*Derek & Constance Lee Corp. v. Kim Seng Co.*, 391 Fed.App'x 627 (9th Cir.
  2010) .....................................................................................................23

*Eliminator Custom Boats v. Am. Marine Holdings, Inc.*, No. ED CV 06-15-
  VBF(Ex), 2007 WL 4978243 (C.D. Cal. Nov. 5, 2007) ...............................22

*Estate of Bowles,* 169 Cal.App.4th 684 (2008) .........................................29, 30

*Estate of Fuller v. Maxfield & Oberton Holdings, LLC*, 906 F.Supp.2d 997
  (N.D. Cal. 2012).......................................................................................23

*Estate of Sanders* 40 Cal.3d 607, 615 (1985); *Estate of Charters,* 46 Cal.2d
  227 (1956) ...........................................................................................28, 43

*Fed. Election Comm'n v. Williams*, 104 F.3d 237 (9th Cir. 1996) ...................11

*GO Computer, Inc. v. Microsoft Corp.*, 508 F.3d 170 (4th Cir. 2007)...........33

*Grupo Gigante S.A. De C.V. v. Dallo & Co.*, 391 F.3d 1088 (9th Cir. 2004)..................35

*Halstead v. Grinnan*, 152 U.S. 412 (1894).............................................................35

*Hennegan v. Pacifico Creative Serv., Inc.*, 787 F.2d 1299 (9th Cir. 1986).......................24

*Hudson v. Foster*, 68 Cal.App.5th 640 (2021) ................................................28, 43

*Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829 (9th Cir. 2002) .13, 22, 35, 36

*Jorgensen v. Jorgensen*, 32 Cal.2d 12 (1948) .............................................28, 43

*King v. Johnston*, 178 Cal.App.4th 1488 (2009) ...................................29, 30, 31

*Kiva Health Brands LLC v. Kiva Brands Inc.*, 439 F. Supp. 3d 1185 (N.D. Cal. 2020)......................................................................10

*Kythera Biopharmaceuticals, Inc. v. Lithera, Inc.*, 998 F. Supp. 2d 890 (C.D. Cal. 2014)......................................................................15

*McCall v. Andrus*, 628 F.2d 1185 (9th Cir. 1980).............................................39

*New Era Publ'ns Int'l v. Henry Holt & Co.*, 873 F.2d 576 (2d Cir. 1989) .......................14

*Oracle Am., Inc. v. Hewlett Packard Enter. Co.*, 971 F.3d 1042 (9th Cir. 2020) ......................................................................22

*Petrella v. Metro-Goldwyn-Mayer, Inc.* 572 U.S. 663 (2014) ..................................22, 37

*Piper Aircraft Corp. v. Wag-Aero, Inc.*, 741 F.2d 925 (7th Cir. 1984) .............................13

*Richman v. Hartley* (2014) 224 Cal.App.4th 1182 ............................................16

*Rutledge v. Boston Woven Hose & Rubber Co.*, 576 F.2d 248 (9th Cir. 1978) ...............33

*Saks v. Damon Raike & Co.*, 7 Cal.App.4th 419 (1992) ......................................29

*See Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) ..................15

*Seller Agency Council, Inc. v. Kennedy Ctr. For Real Est. Educ., Inc.*, 621 F.3d 981 (9th Cir. 2010)......................................................................13

*Smith v. Davis*, 953 F.3d 582 (9th Cir. 2020) ................................................11

*Starz Entertainment, LLC v. MGM Domestic Television Distribution, LLC*, 39 F.4th 1236 (9th Cir. 2022)......................................................................22

*Stone v. Williams*, 970 F.2d 1043 (C.A.2 1992) ..............................................37

*Tillamook Country Smoker, Inc. v. Tillamook County Creamery Association*, 465 F.3d 1102 (9th Cir. 2006)..............................................................35, 36

*UMG Recordings, Inc. v. Augusto*, 628 F.3d 1175 (9th Cir. 2011)..................................15

*Volk v. D.A. Davidson & Co.*, 816 F.2d 1406 (9th Cir. 1987)............................25, 32, 33

*Vu v. Prudential Prop. & Cas. Ins. Co.*, 26 Cal.4th 1142 (2001)......................................23

MOTION FOR SUMMARY JUDGMENT

*Welco Elecs., Inc. v. Mora* (2014) 223 Cal. App. 4th 202.................................17

**STATUTES**

17 U.S.C. § 501(a) ........................................................................15

17 U.S.C. § 507 ....................................................................10, 22

Cal. Bus. & Prof Code § 17200 ...............................................16

Cal. Bus. & Prof. Code § 17208 ..............................................23

Cal. Bus. & Prof Code § 17208 ..............................................23

Cal. Civ. Code § 1691 ......................................................18, 45

Cal. Civ. Code § 1693 ...............................................................18

Cal. Civ. Code § 3344 ...............................................................23

Cal. Civ. Code § 3344.1 .................................................17, 23, 44

CCP § 338..............................................................................10, 23

CCP § 339.....................................................................................10

CCP §337.....................................................................................23

FRCP 56(a) ....................................................................................8

FRCP 56(c) ....................................................................................8

MOTION FOR SUMMARY JUDGMENT

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

Defendants CINTAS ACUARIO, INC., a California corporation ("Cintas"), and AYANA MUSICAL, INC., a California corporation ("Ayana") (collectively, "Defendants"), hereby move the Court, pursuant to Federal Rule of Civil Procedure ("FRCP") 56, for summary judgment, or, in the alternative, summary adjudication (the "Motion") as to the First Amended Complaint (the "FAC") filed on December 22, 2023 by Plaintiffs JENNI RIVERA ENTERPRISES, LLC, a California limited liability company ("JRE"), and JAQUELIN CAMPOS, an individual ("Campos"), in her capacity as executrix of the ESTATE OF DOLORES J. RIVERA (the "Estate"), the successor-in-interest to the rights of Dolores J. Rivera, professionally known as Jenni Rivera (collectively, "Plaintiffs").

## I.    <u>DEFENDANTS' INTRODUCTION</u>

In its December 18, 2023 Order, this Court recognized that Plaintiffs' claims, as originally pled, fell outside of all applicable statute of limitations periods, and could not survive without application of a tolling doctrine. Dkt. 32. In response to Plaintiffs' assertion of fraudulent concealment, this Court also recognized that "Campos's knowledge is not determinative … it is the estate's and JRE's knowledge that matters…" *Id.* Further, this Court observed that "the fact Campos discovered the wrongdoing immediately upon assuming her role as executrix suggests that the wrongdoing was fairly apparent" and that "[t]he complaint's admission that there were other executives, employees and representatives working at JRE leaves open the unaddressed possibility that someone at JRE could have – or should have – discovered the alleged wrongdoing." *Id.*

In response to the Court's December 18, 2023 Order, Plaintiffs amended their claims to allege, as this Court characterized it in its subsequent February 9, 2024 Order, "a deliberate scheme by Pedro, Rosie, and Juan, using their positions at Cintas, Ayana, and JRE, to enrich themselves at Plaintiffs' expenses…" Dkt. 42. This Court stated that "[i]f Plaintiffs allegations are true … then Plaintiffs … were

1

effectively controlled by agents of Defendants who thwarted Plaintiff's ability to discover the alleged scheme until December 2021." *Id*. Now, after significant written discovery and numerous depositions, enough evidence exists for this Court to conclusively determine that no alleged scheme or concealment of wrongdoing existed or took place, and that Plaintiffs' Claims therefore fail due to the expiration of all applicable statutes of limitations.

## II.    **PLAINTIFFS' INTRODUCTION**

This Court recognized from the outset the potential conflict of interest between Pedro, Cintas, and Ayana on one hand, and Rosie (and Juan) on the hand, during the time Rosie was in control of Plaintiffs. *See* Dkt. 42. And, discovery in this case revealed that Rosie not only trusted her father's representations, and carried out his wishes, unquestioningly throughout that time, but that Rosie withheld pertinent information from the Beneficiaries related to Defendants' failures to account and pay royalties owed to Plaintiffs, despite being legally obligated to disclose same.

Moreover, discovery revealed that Rosie was actually working for, and being paid by, Cintas, and also executing agreements on behalf of Ayana, during the time she was in control of Plaintiffs, and was the individual responsible for protecting Plaintiffs' and the Beneficiaries' rights. Rosie's conflicts of interest and breaches of her fiduciary duties, standing alone, are fatal to Defendants' request for summary judgment based on the assertion that Rosie's knowledge should be imputed to Plaintiffs.

Summary judgment is certainly not proper here because Defendants are otherwise unable to irrefutably establish the Beneficiaries' actual or constructive knowledge, especially in light of each of the Beneficiaries declaring definitively that they had no knowledge of Defendants' failure to issue royalty statements, no knowledge of Defendants' failure to make royalty payments, and no knowledge of any outstanding debts allegedly owed by Jenni to Cintas, until March or April of

2

2022—less than two years prior to filing the instant lawsuit.

## III.    DEFENDANTS' RELEVANT FACTUAL ALLEGATIONS

Defendant Cintas is a Latin music record label that has produced, recorded and distributed the musical hits of many famous Latin music artists, including the popular singer-songwriter Jenni Rivera ("Jenni"). Joint Appendix of Facts ("JAF") at ¶¶ 1-2. Defendant Ayana is also a Latin music record label. JAF at ¶ 3. Pedro Rivera was Jenni's father, and is the founder and sole owner of Cintas and Ayana. JAF at ¶¶ 4-5.

### A.    The Recording Agreements

During her lifetime, Jenni executed recording agreements with Cintas that included agreements executed on or about April 15, 1993 (the "1993 Agreement"), September 1, 1995 (the "1995 Agreement"), and April 21, 1996 (the "1996 Agreement"), respectively (collectively, the "Recording Agreements"). JAF at ¶¶ 6-8. Within each Recording Agreement, Jenni agreed to exclusively record multiple albums (collectively, the "Works"), and grant Cintas all rights therein, in exchange for Cintas' agreement to pay Jenni a royalty on the sale thereof (i.e., an "Artist Royalty"). JAF at ¶¶ 9-11. Jenni also granted Cintas the "perpetual right" to exploit her name, image and likeness ("NIL") "for the purpose of advertising, promoting, selling, and otherwise merchandising records" as well as to promote Cintas' business generally. JAF at ¶¶ 12-14.

All three Recording Agreements contemplated quarterly royalty statements, but, in Section 4(f) of the 1993 Agreement, the parties also agreed that "[a]ny objection … to any royalty statement shall be deemed waived unless it is transmitted" "within 8 weeks from the date of the statement." JAF at ¶ 15. Additionally, in Section 4(e) of the 1995 and 1996 Agreements, the parties agreed that "[n]o action, suit, or proceeding … in respect of any royalty statement … may be … commenced … within one (1) year after the date rendered." JAF at ¶¶ 16-20. Section 20 of the 1995 and 1996 Agreements also set forth that "[n]o termination of

[the] agreement … shall in any way limit or curtail any of [Cintas]'s rights, title, interest, or privilege to or in connection with any of the results and proceeds of [Jenni]'s endeavors under [the] agreement." JAF at ¶¶ 21-22.

## B.    The Formation of Plaintiffs

On or about December 9, 2012, Jenni tragically passed away in a plane crash over Mexico. JAF at ¶ 23. She was survived by her father and mother, Pedro and Rosa Rivera, her siblings Pedro Jr., Gustavo, Lupillo, Juan, and Rosie Rivera, and her children Janney Marin Rivera, Trinidad Marin, Jacquelin Campos, Jenika Lopez, and Juan Lopez. JAF at ¶ 24. When she died, Janney was 27, Jacquelin was 23, Trinidad was 21, Jenika was 15, and Juan was 12 years old. JAF at ¶ 25.

Just prior to her passing, Jenni had formed a trust, called The Dolores J. Rivera Living Trust (the "Trust"), and named her younger sister, Rosie, as the primary trustee. JAF at ¶ 26. Jenni also initially named her eldest daughter, Janney, as the secondary trustee, but later removed her both as trustee and beneficiary and named her second eldest daughter, Jacquelin. JAF at ¶ 27. The beneficiaries of the trust were, therefore, Trinidad, Jacquelin, Jenika and Juan (collectively, the "Beneficiaries"). JAF at ¶ 28.

On or about August 21, 2013, the limited liability company that ultimately became JRE was formed to handle all music-related aspects of Jenni's business. JAF at ¶ 29. Because Rosie was the trustee, she also became CEO of JRE. JAF at ¶ 30. Additionally, Rosie became, in effect, the CEO of another limited liability company, called Jenni Rivera Fashion ("JRF"), which was ultimately established to operate all fashion-related aspects of Jenni's business. JAF at ¶ 35.

## C.    Rosie's Operation of Jenni's Business

Prior to being thrust into the role of trustee and CEO of JRE and JRF, Rosie had no professional experience in the entertainment industry, generally, or the music industry, specifically. JAF at ¶ 36. She took over in or about January 2013 solely to honor Jenni, as her older sister and best friend, and to take care of Jenni's children

4

until they were capable of running the Trust and business themselves. JAF at ¶ 37. In exchange, Rosie received a modest salary of $64,000 per year, which increased to $84,000 per year by 2021. JAF at ¶ 38.

When Rosie took over, JRE had a total of three full-time employees, each of whom stayed on initially before voluntarily resigning. JAF at ¶¶ 39-40. Rosie also continued to utilize the business manager Jenni had originally appointed prior to her death, named Louis Barajas, to help Rosie run JRE and JRF. JAF at ¶ 41. At the recommendation of Jenni's estate planning attorneys, the corporation version of JRE was terminated, and an unused limited liability company called 3JM, LLC was renamed, so that JRE could carry on its business in its current form. JAF at ¶ 42.

Throughout her tenure, Rosie made a concerted effort to include the Beneficiaries (and Janney) in all important decisions she made regarding Jenni's business. JAF at ¶ 43. Rosie kept them informed through a family group chat, as well as via periodic in-person meetings. JAF at ¶ 44. Each of the children demonstrated varying levels of desire to be involved in the business, but all of them were involved, to some degree, in the day-to-day operations, including regarding the publication of Jenni's biography, the production of her tequila brand, the design of various clothing items, the development of Jenni's perfume line, and the production of Jenni's English pop album. JAF at ¶¶ 45-46.

Jacquelin became the most involved in her late-mother's business, taking over the operations of Jenni's charity, Jenni Rivera Love Foundation, Inc., and taking on the formal position of Secretary of JRE in or about the end of 2013. JAF at ¶¶ 47-48. In such position, she signed checks on behalf of JRE and had access to the company's bank account. JAF at ¶¶ 49-50. Jacquelin's desk at JRE's office was also right next to Rosie's, and Rosie confided in Jacquelin regarding many different aspects of the business, particularly given that Rosie had hoped Jacquelin would one day take over as Trustee and CEO of JRE and JRF. JAF at ¶¶ 51-52.

Because Cintas owned most of Jenni's Works, as well as rights in her NIL, Rosie was forced to work opposite her father, Pedro, in JRE's business dealings with Cintas. JAF at ¶ 53. This relationship dynamic was difficult for Rosie because Pedro was her father, and it caused disputes, but Rosie always advocated for the interests of Jenni's children, and the business, above her relationship with her father. JAF at ¶¶ 54-55. For example, Rosie confronted her father over his use of Jenni's NIL in merchandise that Cintas nevertheless had the right to sell. JAF at ¶ 56.

### D. Cintas' Accounting To JRE And Discovery Of Overpayments

Under the Recording Agreements, Cintas was obligated to pay Jenni a percentage of Artist Royalties that ranged from ten to fifty percent. JAF at ¶¶ 57-59. However, Pedro agreed to pay Jenni fifty percent across the board on all revenue received from the exploitation of all of her Works. JAF at ¶ 60. Until in or around 2014 or 2015, Cintas also utilized a computer program to track its receipt of royalties due to JRE, and to report such amounts. JAF at ¶ 61.

Before her death, Jenni walked away from her final recording agreement with Defendants entered into in or about 2005. JAF at ¶ 62. She then approached Universal Music Group ("UMG"), which was distributing her Works, and asked that UMG account for and pay all Artist Royalties directly to her. JAF at ¶ 63. At the time, Pedro was not aware Jenni had made this request. JAF at ¶ 64.

Accordingly, for a period before and after Jenni's passing, Jenni/JRE received seventy-five (75%) percent of all monies derived from exploitation of the Works. JAF at ¶ 65. This was because UMG was paying fifty percent directly to Jenni/JRE, while Cintas was simultaneously paying half of its fifty percent (50%) to Jenni/JRE (under the mistaken belief that it was still receiving one hundred percent of all such monies from UMG). JAF at ¶ 66.

Eventually, in or about 2010, Pedro learned that he might not have received his half of one or more advances paid to Jenni/JRE. JAF at ¶ 67. Accordingly, Pedro asked his attorney to inquire with UMG. JAF at ¶ 68. UMG eventually informed

Cintas of the direct payment arrangement it had with Jenni/JRE, revealing Cintas' overpayment related accounting error for the first time. JAF at ¶ 69. Cintas' royalty manager, Fabiola Avalos, subsequently reported this fact, and what Cintas had then determined to be an overpayment of $205,788.61, to Rosie via an email sent on or about November 14, 2016. JAF at ¶ 70.

Avalos now claims that, pursuant to a "scheme" concocted between Pedro, Rosie and Juan, Pedro asked her, *in 2015*, to "falsify" the $50,120.90, $10,555.70 and $8,811.78 overpayments identified in her November 14, 2016 email. JAF at ¶ 71. Not only does Pedro flatly deny such claim, but her claim is contradicted by an email from UMG's counsel to Cintas' counsel *on August 28, 2013*, confirming that the same amounts of $50,120.90, $10,555.70 and $8,811.78 were, in fact, overpayments to Jenni/JRE. JAF at ¶¶ 69, 72. Avalos also admitted that she never witnessed any "secret meeting" between Pedro, Rosie and Juan where any alleged scheme was discussed or concocted. JAF at ¶ 73.

When Avalos reported Cintas' accounting error to Rosie, she also advised Rosie that Cintas was willing to accept a lesser amount of $150,000 to resolve the identified overpayment. JAF at ¶ 74. Neither Rosie nor anyone else at JRE protested Cintas' findings reported in Avalos' November 14, 2016 email, and Rosie, on behalf of JRE, agreed to pay back the lesser amount in connection with her request that all future royalty payments due to JRE be applied against what Cintas was owed until Cintas was made whole. JAF at ¶¶ 75-76. Cintas accepted this offer, providing at least two statements where amounts received by Cintas and due to JRE were applied against the overpayment total. JAF at ¶¶ 77-78.

E.   **The Audit And Rosie's Resignation**

In or about 2021, Juan Lopez requested an accounting of his sub-trust, which he and all of the other the Beneficiaries established to receive their respective shares of Trust funds. JAF at ¶ 79. Accordingly, a formal accounting of his sub-trust and the Trust were conducted, and all of the assets of the Trust (which included JRE and

JRF) were reviewed. JAF at ¶ 80. On or about October 14, 2021, the accounting was completed, and a "Report and Account" of the Trust was issued regarding the findings thereof (the "Audit Report"). JAF at ¶ 81.

The Audit Report did not reveal any irregularities. JAF at ¶ 82. Section 4(a) of the Audit Report set forth that "[a]ny person having an interest in the Trust may petition the court … to obtain a court review of this Report and Account and the acts of the Trustee." JAF at ¶ 83. None of the Beneficiaries challenged the findings of the Audit Report, or the acts of Rosie as Trustee. JAF at ¶ 84.

Despite the Audit Report's findings, Rosie agreed to resign as Trustee, and as CEO of JRE and JRF, on January 1, 2022. JAF at ¶ 85. In connection with her resignation, Jacquelin, as the new Trustee and CEO of JRE and JRF, worked with Rosie to prepare a press release addressing Rosie's resignation, which was issued on or about January 4, 2022. JAF at ¶ 86. Therein, Jacquelin stated:

> "I am grateful for the efforts made by my aunt in our behalf after the death of our mother in order to honor her wishes and take care of our financial and emotional needs during these last 9 years. She served in her double roles with pride and integrity. An audit of the Trust was performed in preparation for this change. In spite of recent communication mediation reports, there was no evidence of any crime, misappropriation or theft of fiduciary funds by Rosie, while acting as fund trustee." JAF at ¶ 85.

## IV. LEGAL STANDARD

A court may grant summary judgment if the moving party can show that there is **no genuine dispute** of material fact. FRCP 56(c). *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Material facts are those necessary to the proof or defense of a claim. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Partial summary judgment is also appropriate where there is no genuine dispute as to any material fact regarding any part of a claim. FRCP 56(a).

The moving party has the initial burden of establishing either the absence of a material fact, or that the nonmoving party failed to present evidence establishing an

MOTION FOR SUMMARY JUDGMENT

essential element of its case. *Anderson*, 477 U.S. at 256; *Celotex*, at 322-23. The moving party need not support its motion with affidavits or other similar materials negating the opponent's claim. *Id.* at 323. Once this initial burden is met, the burden shifts to the nonmoving party to show a genuine dispute of material fact. *Id.* at 324.

## V.  DEFENDANTS' ARGUMENT

### A.  Each Of Plaintiffs' Claims Is Time-Barred

Each claim in the FAC is either barred by the contractual limitations periods set forth in the Recording Agreements, or by an applicable statute of limitations. The Beneficiaries vis-à-vis Plaintiffs have been on notice of Cintas' alleged infringement since 2013, and its accounting error resulting in a halting of royalty statements and payments since 2016. All of Plaintiffs' claims are thus time-barred.

#### 1.  One or More Of Plaintiffs' Claims Are Barred By The Contractual Limitations Periods In The Recording Agreements

It is undisputed that the Recording Agreements contain contractual limitations periods. Section 4(f) of the 1993 Agreement bars Plaintiffs from objecting to any statement beyond eight weeks of issuance, and Section 4(e) of the 1995 and 1996 Agreements bar Plaintiffs from commencing any action within one year of rendering of any statement. Plaintiffs' Third Claim for Relief, and any other Claim for Relief based on the theory that Defendants infringed rights originally granted to them via the Recording Agreements but which are now rescinded due Defendants' halting of payments, therefore fail. This is because Plaintiffs should have challenged Defendants' 2016 reporting of overpayments, which formed the basis of their halting of payments, within eight weeks to a year of receipt of such reporting.

Plaintiffs may argue that the contractual limitations periods are not applicable because "formal" statements were not provided. But the evidence shows that Avalos' reporting to JRE of what Defendants received and what JRE was owed – including via subsequent ledgers showing payments received and applied against the overpayment – constituted sufficiently proper accounting statements. And even if

such statements were not as robust as may typically be expected in the music industry, the Recording Agreements themselves are silent as to what would qualify as proper accounting statements if Defendants' reporting did not.

        2.    <u>All Of Plaintiffs' Claims Are Barred By Applicable, Statutorily-Imposed Limitations Periods</u>

*Even if* the Court finds that the applicable contractual limitations periods do not bar one or more Claims for Relief, all relevant statutory limitations periods must. Each of the Claims in the FAC carries either a three- or four-year statute of limitations, all of which accrued upon the discovery of the applicable harm. 17 U.S.C. § 507; *Kiva Health Brands LLC v. Kiva Brands Inc.*, 439 F. Supp. 3d 1185, 1194 (N.D. Cal. 2020); California Code of Civil Procedure ("CCP") § 337; California Business and Professions ("Cal. Bus. & Prof") Code §17208; CCP § 339; CCP § 338. Every Claim is therefore barred because each one is based upon actions that Plaintiffs have known existed since between 2013 and 2016.

Plaintiffs' First, Second, Fifth and Seventh Claims for Relief are based upon Defendants' allegedly unauthorized exploitation of sound recordings or trademark/NIL rights. But it is undisputed that Defendants' distribution of the Works, and use of Jenni's trademarked name/NIL rights in connection with the promotion and distribution thereof, has been out of the in open since JRE and the Trust were formed. Moreover, it is undisputed that Rosie, in her capacity as JRE's CEO, knew of Defendants use of Jenni's trademark/NIL rights *and discussed such use with the Beneficiaries well before 2022*. JAF ¶ 56.

Additionally, Plaintiffs' Third Claim for Relief is based upon Cintas' alleged failure to pay royalties, and to provide royalty statements. But any alleged failure in such regard stems from Defendants' discovery of overpayments *reported to JRE via email in 2016*. Plaintiffs contend that the Beneficiaries were unaware of Defendants' alleged failure at that time, but (1) JRE was aware, (2) Rosie kept the Beneficiaries informed of all JRE and Trust business, and (3) Jacquelin – who was Secretary of

JRE *and* a Beneficiary – had access to JRE's bank accounts and was in a position to discover such failure.

3. <u>The Tolling Doctrine Should Not Be Applied Because There Was No Fraudulent Concealment</u>

The doctrine of equitable tolling pauses the statute of limitations where a litigant pursued its rights diligently, and some extraordinary circumstance prevented the litigant from bringing a timely action. *Arellano v. McDonough*, 598 U.S. 1, 6 (2023); *Smith v. Davis*, 953 F.3d 582, 588 (9th Cir. 2020). To establish equitable tolling, Plaintiffs must prove: (1) fraudulent conduct by Defendants resulting in concealment of the operative facts; (2) failure of Plaintiffs to discover the operative facts that are the basis of its claim for relief within the limitations period; and (3) due diligence by Plaintiffs until discovery of those facts. *Fed. Election Comm'n v. Williams*, 104 F.3d 237, 240-241 (9th Cir. 1996).

a. *Defendants Did Not Engage In Any Fraudulent Conduct*

There can be no question from the testimony of Rosie Rivera, and the independent, undisputed results of the 2021 accounting, that no fraudulent conduct occurred during Rosie's time as Trustee and CEO of JRE. She made all decisions in the best interests of the Beneficiaries, relied on the business advice of JRE's independently appointed business manager and attorneys, and always kept the Beneficiaries informed. She made an extremely modest salary during her time as CEO, was not compensated by the Trust until she resigned, and never had any secret deal to take over Defendants after she left JRE. JAF at ¶ 87.

Plaintiffs pin their hopes on Fabiola Avalos' claim that she was asked by Pedro Rivera in 2015 to "falsify" overpayment numbers reported to JRE in 2016. Avalos' contention, however, is not only denied by Pedro but contradicted by the independent investigation of UMG's attorney in 2013, which revealed the exact overpayment amounts Avalos claims were "falsified." Because of Pedro's denial, the irreconcilable timeline, and the fact that the exact amounts claimed to be

MOTION FOR SUMMARY JUDGMENT

falsified can be independently confirmed, Avalos' claim does not establish a genuine dispute of fact.

And even if Pedro did "falsify" numbers as Avalos claims, **the critical question is whether Rosie[2] participated in such fraudulent conduct in order to prevent the Beneficiaries from exercising reasonable diligence earlier than 2022**. Here, it is undisputed that no such scheme existed. To date, no one has presented any evidence that they were a witness to, or otherwise had direct knowledge of, the formation of any scheme between Pedro, Rosie and Juan. Further, there is no evidence of any secret deal for Rosie to take over, or otherwise be enriched by, Defendants, in exchange for an agreement to be complicit in any fraud engaged in by Defendants. JAF at ¶ 87.

Plaintiffs will attempt to manufacture a genuine dispute of fact by presenting evidence that Rosie and Juan had Cintas emails during their employment with JRE, received contingent compensation for their work benefiting JRE and the Trust, and did work outside of JRE during their employment with JRE. But none of such circumstantial evidence suggesting wrongdoing arises to the level of contradicting the mountains of direct evidence that no wrongdoing occurred. Plaintiffs must present evidence of a **genuine** dispute of **material** facts, and nothing Plaintiffs will put forth arises to that level. *See Anderson*, 477 U.S. at 247–48 (stating that only "disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").

b.    *Plaintiffs Were Aware Of The Operative Facts That They Now Claim Form The Basis Of Plaintiffs' Concealment*

By virtue of her relationship to Rosie, her open line of communication with Rosie about JRE-related matters, her position in JRE, and her access to JRE bank accounts, Jacquelin was – or should have been – aware of Defendants' non-payment

---

2 Plaintiffs allege that Juan Rivera also participated in the alleged scheme, but it is undisputed that Juan had no role in the management of JRE. JAF ¶¶ 31-34.

of royalties. Furthermore, there are no facts evidencing a secret deal between Rosie and Defendants to advance a scheme not to pay JRE royalties. Even if Rosie had a familial relationship with Pedro, it is undisputed that Rosie kept the Beneficiaries well informed of all JRE business, and encouraged them to become more involved in such business to the extent they so desired. JAF ¶¶ 44-46.

### c. *Plaintiffs Failed To Exercise Due Diligence To Discover Any Perceived Issues Sooner*

Given Jacquelin's position, her failure to exercise due diligence to discover Defendants non-payment is also wholly unreasonable. As is the failure of the other Beneficiaries to exercise a similar degree of diligence, in light of Rosie's efforts to include them in decisions and encourage them to participate more in JRE and JRF business. At a minimum, one or more of the Beneficiaries could have requested an accounting sooner than 2021, and their failure to do so is inexcusable.

### B. **Each Of Plaintiffs' Claims Are Barred By The Doctrine of Laches**

Laches is an equitable defense that operates as a time limitation on a party's right to bring suit, resting on the maxim that a party who seeks help from a court of equity "must not sleep on his [or her] rights." *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 835 (9th Cir. 2002) (quoting *Piper Aircraft Corp. v. Wag-Aero, Inc.*, 741 F.2d 925, 939 (7th Cir. 1984)). In determining whether to apply this affirmative defense, the Court must use a two-part test, in which it looks, first, at whether the plaintiff's delay in bringing suit was unreasonable, and, second, at whether the defendant was prejudiced by the delay. *Seller Agency Council, Inc. v. Kennedy Ctr. For Real Est. Educ., Inc.*, 621 F.3d 981, 989 (9th Cir. 2010). The first element of such evaluation consists of "two sub-parts: an assessment of the length of the delay followed by an assessment of the reasonableness of the delay." *Id.*

### 1. Plaintiffs' Delay Was Unreasonable

Plaintiffs' First, Second, Fifth and Seventh Causes of Action are based upon Defendants' allegedly unauthorized exploitation of sound recordings, or

MOTION FOR SUMMARY JUDGMENT

trademark/NIL rights. But it is undisputed that Defendants' distribution of works of Jenni recorded by them, and use of Jenni's trademarked name and NIL rights in connection with the promotion and distribution thereof, has been out in open since JRE and the Trust were formed. Accordingly, Plaintiffs' nearly ten-year delay in bringing any of such Causes of Action is objectively unreasonable.

With respect to Plaintiffs' Third Claim for Relief, Defendants' substantially halted royalty payments following their discovery of overpayments to JRE in 2013, which they reported to JRE in 2016. Thus, royalty payments to JRE substantially ceased in 2013 (i.e., nine years before filing suit in 2022), and the reason therefore was formally reported to JRE in 2016 (i.e., six years before filing suit in 2022). Under either calculation, Plaintiffs' delay in bringing such Claim was also unreasonable. *See e.g., New Era Publ'ns Int'l v. Henry Holt & Co.*, 873 F.2d 576, 585 (2d Cir. 1989) (holding that a two-year delay, combined with "severe prejudice" supported an equitable defense for laches).

### 2.    Plaintiffs' Delay Has Prejudiced Defendants

At least up until 2021, when Jacquelin took over as CEO of JRE, Plaintiffs' actions (and inaction) – including, without limitation, by requesting in 2016 that all future royalty payments due to JRE be applied against what Cintas was owed from overpayments until Cintas was made whole – clearly indicated to Defendants that Defendants' exploitation of rights under the Recording Agreements, and halting of royalty payments until the overpayment was recouped, were permissible. What is worse, Defendants have relied on such actions and inaction for years. Thus, Defendants would be severely prejudiced if Plaintiffs were able to reverse all of that prior history now and use this case as a pretext to divest Defendants of their ownership of valuable rights acquired via validly executed Recording Agreements.

///

///

///

MOTION FOR SUMMARY JUDGMENT

**C.** **Plaintiffs' First Claim For Relief Fails Because Plaintiffs Cannot Show Ownership Of The Relevant Rights Or Infringement Thereof**

"To establish a prima facie case of copyright infringement, a plaintiff must show (1) ownership of a valid copyright and (2) violation by the alleged infringer of at least one of the exclusive rights granted to copyright owners by the Copyright Act[.]" *UMG Recordings, Inc. v. Augusto*, 628 F.3d 1175, 1178 (9th Cir. 2011). "[A]nyone who is authorized by the copyright owner to use the copyrighted work in a way specified in the statute…is not an infringer of the copyright with respect to such use. *See Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 433 (1984) (quoting 17 U.S.C. § 501(a)). Here, Plaintiffs' First Claim for Relief fails because Plaintiffs cannot show that they own all of the copyrighted works, or that any of such works were infringed.

Plaintiffs allege that they are the rightful owners of the "JRE Copyrighted Works", which they assert include works listed on Exhibit E to the FAC. But, with respect to those works, either Plaintiffs have no evidence that Defendants distributed them without authorization (as with "Mision Cumplida"), or Plaintiffs have no evidence to dispute the fact that such Works were recorded under a recording agreement between Jenni and Defendants (as with "Gran Senora En Vivo", "Joyas Prestadas" and "La Misma Gran Senora"). And with respect to any other Works not listed on Exhibit "E" to the FAC, it is undisputed that they were recorded pursuant to one of the Recording Agreements, which means that Plaintiffs do not own them.

**D.** **Plaintiffs' Second Claim For Relief Fails Because Cintas Owns Jenni's Applicable NIL Rights Via The Recording Agreements**

To establish trademark infringement, a plaintiff "must show: (1) that it has a valid, protectable trademark, and (2) that defendant's use of the mark is likely to cause confusion." *Kythera Biopharmaceuticals, Inc. v. Lithera, Inc.*, 998 F. Supp. 2d 890, 898 (C.D. Cal. 2014). Plaintiffs have brought this Claim because they have

registered trademarks in Jenni's name, but it is undisputed that Defendants at all times possessed the perpetual right to exploit Jenni's NIL to promote the Works, and Plaintiffs have no evidence that Defendants used Jenni's name in any other way.

Accordingly, this Claim fails.

## E.    Plaintiffs' Third Claim For Relief Fails Because Defendants Have Not Breached The Recording Agreements

To prevail on a claim for breach of contract, a plaintiff must prove: (1) the existence of a contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damage to the plaintiff as a result of the Defendant's breach. *Richman v. Hartley* (2014) 224 Cal.App.4th 1182, 1186. With respect to the provision of accounting statements, not only did Defendants provide statements until 2016, but Jenni's revised payment arrangement with UMG also resulted in her direct receipt of royalty statements. And with respect to payments, Defendants never breached the Recording Agreements because JRE agreed to a modification of Defendants' payment obligations upon discovery of overpayments in 2016. And *even if* Defendants technically breached the Recording Agreements, Plaintiffs waived any such breach via their course of conduct with Defendants from 2016 on.

## F.    Plaintiffs' Fourth Claim For Relief Fails Because Plaintiffs' First, Second And Fifth Causes of Action Fail

Unfair competition is "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof Code § 17200. A claim under the "unlawful" prong[3] can be asserted if the plaintiff sets forth the existence of a separate, independently actionable violation of law. *Cel-Tec Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180. This Claim therefore fails because Plaintiffs' First, Second and Fifth Claims for violations of other laws fail.

---

3 Plaintiffs cannot establish either the "unfair" or "fraudulent business practices" prong because such prongs only apply to protect consumers and commercial competitors. *Linear Tech. Corp. v. Applied Materials, Inc.*, 152 Cal.App.4th 115 (2007) ("Where a UCL action is based on contracts not involving either the public in general or individual consumers who are parties to the contract, a corporate plaintiff may not rely on the UCL for relief it seeks.")

**G.** **Plaintiffs' Fifth Claim For Relief Fails Because Cintas Owned Jenni's Applicable NIL Rights Via The Recording Agreements**

California Civil ("Cal. Civ.") Code § 3344.1 provides a statutory basis for theft of an individual's NIL rights. However, it is undisputed that Defendants at all times possessed the perpetual right to utilize Jenni's NIL to promote their distribution of the Works, and Plaintiffs have no evidence that Defendants used Jenni's name in any other way. This claim therefore fails.

**H.** **Plaintiffs' Sixth Claim For Relief Fails Because No Facts Exist to Establish Fraudulent Concealment**

To establish fraudulent concealment, Plaintiffs must prove: (1) when the fraud was discovered; (2) the circumstances under which it was discovered; and (3) that the plaintiff was not at fault for failing to discover it or had no actual or presumptive knowledge of facts sufficient to put the plaintiff on inquiry. *Deirmenjian v. Deutsche Bank, A.G.*, No. CV 06-00774 MMM CWX, 2006 WL 4749756, at *42 (C.D. Cal. Sept. 25, 2006). Here, however, Plaintiffs have no evidence of fraud. Accordingly, this Claim fails.

**I.** **Plaintiffs' Seventh Claim For Relief Fails Because No Facts Exist to Establish Conversion**

Conversion is the "wrongful exercise of dominion over the property of another." *Welco Elecs., Inc. v. Mora* (2014) 223 Cal. App. 4th 202, 208. To establish such a claim, the plaintiff must show: (1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages..." *Id.* This Claim is based entirely on the allegation that Defendants "took possession of … significant monies from the exploitation of Jenni's NIL." Accordingly, this Claim fails for the same reason any claim based on the theft of Jenni's NIL fails – because Defendants possess an undisputable right to utilize such rights to promote and distribute the Works.

*///*

**J.**    **Plaintiffs' Claim For Recission Of The Recording Agreements And
All Of Defendants' Rights Therein Cannot Be Established**

A party must "promptly upon discovering the facts which entitle [it] to
rescind" provide the other party with notice, and offer to restore the consideration
received, if any. Cal. Civ. Code § 1691; *Citicorp Real Estate, Inc. v. Smith*, 155 F.3d
1097, 1103 (9th Cir. 1998). The rescinding party may forfeit the right to rescind
where the delay in bringing suit and/or providing notice substantially prejudiced the
other party. Cal. Civ. Code § 1693; *Citicorp*, 155 F.3d at 1103. The right to rescind
a contract based on an alleged breach also depends on the "gravity of the breach."
*Crofoot Lumber, Inc. v. Thompson*, 163 Cal. App. 2d 324, 332 (1958) ("The injured
party, however, cannot maintain an action for restitution of what he has given the
defendant unless the defendant's non-performance is so material that it is held to go
to the 'essence'; it must be such a breach as would discharge the injured party from
any further contractual duty on his own part").

Plaintiffs attempt to rescind the Recording Agreements must fail because
Plaintiffs have unreasonably delayed in such attempt. Even if Cintas breached the
Recording Agreements by halting royalty payments after discovering their
accounting error, and by failing to provide royalty statements that JRE was already
receiving directly from UMG, Plaintiffs have known of such facts since 2016. It is
therefore unreasonable for Plaintiffs to have waited until 2022 to bring suit.

Additionally, the remedy of recission is not commensurate with the
undisputed facts of this case. If Cintas did breach the Recording Agreements, it was
only because (a) it did not provide royalty statements to JRE that UMG was already
directly providing to JRE; and (b) it discovered a genuine accounting error that
JRE's CEO did not dispute. If the Court now finds that Defendants technically
should have still been providing royalty statements, or that Defendants' math was
wrong and they actually owe JRE royalties, such breaches are not so grave as to
justify the complete divestment of Defendants' rights in the Works.

Finally, and just as importantly, Plaintiffs cannot avail themselves to the remedy of rescission because Jenni waived the right to seek such a remedy when she signed the Recording Agreements. Specifically, Section 20 of the 1995 and 1996 Agreements also set forth that "[n]o termination of [the] agreement … shall in any way limit or curtail any of [Cintas]'s rights, title, interest, or privilege to or in connection with any of the results and proceeds of [Jenni]'s endeavors under [the] agreement." JAF at ¶¶21-22. Accordingly, Plaintiffs' claim for rescission fails.

## VI.   **PLAINTIFFS' ARGUMENT**

When Jenni died, the Beneficiaries were young, 23, 21, 15, and 11 years of age, respectively (Resp. JAF ¶25). Jenni's eldest daughter, Janney Marin, was 26 at the time but had been removed as a beneficiary of the Trust by Jenni prior to her passing (Resp. JAF ¶25).  As Janney Marin and her siblings grieved the loss of their mother, their aunt Rosie Rivera became the Trustee of the Trust, and subsequently, CEO of the successor JRE entity (owned by the Trust), while their grandfather, Pedro Rivera, continued to commercially exploit Jenni's albums and songs recorded under the Recording Agreements, and worked with Rosie, his daughter, in connection therewith (JAF ¶53). Admittedly, the working relationship between Rosie, on behalf of JRE, and Pedro, on behalf of Defendants, was difficult for Rosie since Pedro was her father, and it caused disputes and conflicts (JAF ¶54).

Against this backdrop, Defendants seek to escape liability for all claims alleged against them by imputing the knowledge of the Trust and JRE, vis-a-vis the then acting Trustee and CEO, Rosie Rivera, upon the Trust and its Beneficiaries. Summary judgment in favor of Defendants on their affirmative statute of limitations and laches defenses should be denied as to all seven claims because there are genuine disputes of material fact concerning whether Rosie had a conflict of interest with Defendants and her father, and whether Rosie breached her fiduciary duties to the Trust and its Beneficiaries, particularly as relates to her duty to avoid conflicts of interest and to report and account.

Defendants admit to the "halting of royalty statements and payments since 2016" (Joint Brief 9:9-11). And, Pedro Rivera himself instructed Cintas' royalties manager, Fabiola Avalos, to stop preparing and issuing royalty statements relating to Jenni Rivera (Resp. JAF 88). At the same time, Cintas stopped making any royalty payments (Resp. JAF 89). These admissions put Defendants in breach of the Recording Agreements (JAF 15, 18-20).

Instead of issuing royalty statements and making royalty payments, Pedro Rivera instructed Mrs. Avalos to cook the books to show that his daughter Jenni Rivera instead owed Cintas money (Resp. JAF 60, 65, 66, 70). Defendants created their own disputed fact with this pivotal material fact:

> In JAF 71, Defendants state that, "Avalos now claims that, pursuant to a scheme concocted between Pedro, Rosie and Juan, Pedro asked her, in 2015, to falsify overpayments of $50,120.90, $10,555.70 and $8,811.78 identified in her November 14, 2016."

> In JAF 72, however, Defendants state that, "Pedro Rivera denies ever asking Fabiola Avalos to falsify any information provided to JRE regarding revenues received, and Artist royalties paid, in connection with any of the Works."

Cintas, however, had conveniently stop issuing any royalty statements to support this claim. This disputed fact alone defeats Defendants' Motion.

When encountered by her father's wishes relating to the payment of royalties, Rosie was conflicted and outright breached her fiduciary duties as the Trustee by (1) failing to account for the Trust's royalty interests arising from the Recording Agreements; (2) failing to account for the Trust's receipt of royalty payments; and (3) failing to reasonably investigate Cintas' claims that Jenni Rivera owed Cintas money, or Cintas' corresponding decision to stop paying royalties owed under the Recording Agreements (Resp. JAF 75-78). Instead, Rosie Rivera gave deference to the wishes of her father over her duties as the Trustee. *Id.* She was also conflicted by her employment with Cintas and Ayana while acting as the Trustee. *Id.* Rosie's

failures to account, marshal assets, investigate Cintas' non-payment of royalties, and her conflicts of interest were all breaches of her fiduciary duties.

It is therefore not surprising that Rosie Rivera hid her and her father's actions from the Beneficiaries. While Defendants claim that Rosie kept the Beneficiaries informed by texts and chats about JRE's general business operations, Rosie admitted in her deposition that she does not recall a single such communication being about royalty statements or payments (JAF 91). Janney and all the Beneficiaries also agreed that they have never received any communications from Rosie about their mother's royalty statements and royalty payments (JAF 90).

This litigation stems from the current Trustee Jacquelin Campos' recent discovery in March or April 2022 of an Orchard distribution accounting statement for the year 2021 showing the revenues Cintas derived from its exploitation of the Jenni Rivera catalog (JAF 92). Ms. Campos, however, found no corresponding royalty statements or payments from Cintas to JRE for this distribution deal, causing her to be suspicious for the first time of Defendants' unlawful conduct. (JAF 93)

These facts warrant the application by this Court of equitable tolling in connection with the running of the applicable statute of limitations on Plaintiffs' claims.

A.    **The Relevant Limitations Periods**

On September 20, 2023, Plaintiffs filed this action against Defendants. The operative First Amended Complaint, filed on December 22, 2023, alleges seven causes action for violations by Defendants that occurred after the tragic death of Jenni on December 9, 2012 (JAF ¶23), namely, copyright infringement; trademark infringement; breach of contract; violation of *California Business and Professions Code* § 17200; violation of *California Civil Code* § 3344.1; fraudulent concealment; and conversion. The parties do not dispute that the applicable statutes of limitations in connection with Plaintiffs' claims, which range between two to four years of accrual, are as follows:

1) <u>Copyright infringement</u>: **Three years**. A copyright infringement claim must be "commenced within three years after the claim accrued." 17 U.S.C. § 507(b).   As a general rule, a copyright infringement claim accrues "when an infringing act occurs." *Petrella v. Metro-Goldwyn-Mayer, Inc*. 572 U.S. 663, 670 (2014)(labeled "the incident of injury rule").   In *Petrella*, the Supreme Court acknowledged the Ninth Circuit's adoption, as an alternative to the incident of injury rule, a "discovery rule," which starts the limitations period when "the plaintiff discovers, or with due diligence should have discovered, the injury that forms the basis for the claim. *Id. at* 670 n. 4.   "[A] copyright infringement claim accrues –and the statute of limitations begins to run–when a party discovers, or reasonably should have discovered, the alleged infringement."). *Starz Entertainment, LLC v. MGM Domestic Television Distribution, LLC*, 39 F.4th 1236, 1242 (9th Cir. 2022) citing *Oracle Am., Inc. v. Hewlett Packard Enter. Co*., 971 F.3d 1042, 1047 (9th Cir. 2020);

2) <u>Trademark infringement</u>: **Four years**. The Lanham Act does not set any statute of limitations for trademark infringement claims; however, under the most analogous state law, the statute of limitation for trademark infringement claims is four years. "When a federal statute lacks a specific statute of limitations, we generally presume that Congress intended to 'borrow' the limitations period from the most closely analogous action under state law." *Jarrow Formulas, Inc. v. Nutrition Now, Inc*., 304 F.3d 829, 836 (9th Cir. 2002); *see also Eliminator Custom Boats v. Am. Marine Holdings, Inc*., No. ED CV 06-15-VBF(Ex), 2007 WL 4978243, at *3 (C.D. Cal. Nov. 5, 2007)(applying California's four-year statute of limitations to trademark infringement and false designation); *Derek & Constance Lee Corp. v. Kim Seng Co.*, 391 Fed.App'x 627, 628, n.1 (9th Cir. 2010)("We have considered both the three-year limitations period for fraud as provided in California Civil Procedure Code 338(d)…and the four-year limitations period for California

trademark infringement as provided in California Business and Professions Code
17208…to be analogous limitations periods for Lanham Act claims.");

3) <u>Breach of contract</u>:  **Four years**. "The ordinary statute of limitations for
breach of a written contract is four years." *Vu v. Prudential Prop. & Cas. Ins. Co*.,
26 Cal.4th 1142, 1148 (2001); see also *Cal. Civ. Proc.* §337(a);

4) <u>California Business and Professions Code § 17200</u>: **Four years**. Any
action to enforce any cause of action pursuant to this chapter shall be commenced
within four years after the cause of action accrued.  *Cal. Bus. & Prof. Code* § 17208;

5) <u>California Civil Code § 3344.1</u>:  **Two years**.  *Estate of Fuller v. Maxfield
& Oberton Holdings, LLC*, 906 F.Supp.2d 997, 1008 (N.D. Cal. 2012)(the
California Supreme Court has applied a two-year period to a right-of-publicity claim
under § 3344; thus, the Court agrees that the limitations period for Plaintiff's §
3344.1 claim is two years);

6) <u>Fraudulent concealment</u>:  **Three years**. An action for relief on the ground
of fraud or mistake within three years. The cause of action in that case is not deemed
to have accrued until the discovery, by the aggrieved party, of the facts constituting
the fraud or mistake.  *Cal. Civ. Proc.* § 338(d); and

7) <u>Conversion</u>: **Three years**. An action for taking, detaining, or injuring
goods or chattels, including an action for the specific recovery of personal property
within three years.  *Cal. Civ. Proc.*  § 338(c)(1).

**B.**    **<u>The Running Of The Statute Of Limitation On Plaintiffs' Claims
Should Be Tolled</u>**

Despite the relatively large gap in time between the passing of Jenni in 2012
(JAF ¶23), and the filing of Plaintiffs' complaint in 2023, Defendants have not
presented the Court with sufficient irrefutably evidence to demonstrate that
Plaintiffs actually discovered or should have discovered their claims against
Defendants but failed to file a timely complaint.  The Court should view the
evidence in favor of the Defendants, the opposing party, and draw "all justifiable

inferences" in Defendants' favor. *Anderson v. Liberty Lobby, Inc.*, 477 US 242, 255 (1986).

Defendants argue that no equitable tolling should be applied in this case because the Trust and JRE, through Rosie, were on actual notice of alleged infringement by Defendants since as early as 2013 (JAF ¶56), and accounting issues causing a halt to royalty statements and payments to JRE as early as 2016 (JAF ¶70).  Using the limitations periods at issue in this case, they argue that Plaintiffs' claims were time-barred as early as 2015, and by 2020 at the latest.  In reaching this conclusion, Defendants gloss over the undisputed fact that Rosie, as Trustee of the Trust, was bound by various fiduciary duties to the Trust and its Beneficiaries (Resp. JAF ¶75).  Through Rosie's fiduciary breaches, particularly the duty to avoid conflicts of interest and the duty to report and account, genuine disputes of material fact permeate the facts showing that equitable tolling on account of fraudulent concealment is proper in this case.  A statute of limitations may be tolled if the defendant fraudulently concealed the existence of a cause of action in such a way that the plaintiff, acting as a reasonable person, did not know of its existence." *Hennegan v. Pacifico Creative Serv., Inc.*, 787 F.2d 1299, 1302 (9th Cir. 19986).  Rosie's conflict of interest with Defendants and her father, and her fiduciary breaches to the Trust and its Beneficiaries establish the requisite fraud needed for the Trust and its Beneficiaries to pursue these claims as filed in 2023.

The Court recognized this potential conflict of interest with Rosie Rivera in its Order on December 18, 2023, when it stated that, "In what appears to be a potential conflict of interest, Rosie and Juan are also the General Manager and President, respectively, of Defendants Cintas and Ayana." [Dkt. 32]. Here, Rosie Rivera remained an officer of Ayana throughout her tenure as the Trustee (Resp. JAF 75-78).  She was also being paid by Cintas for promoting the company. *Id.*  In the same vein, she was acting for the benefit of her father for work unrelated to the Trust or JRE while using the email account rosie@cintasacuario.com.  *Id.*

24

In order for this Court to grant summary judgment in favor of Defendants on their statute of limitations affirmative defense, they were required to provide uncontroverted evidence that "irrefutably demonstrates that a plaintiff discovered or should have discovered [the cause of action] but failed to file a timely complaint." *Conmar Corp. v. Mitsui & Co. (U.S.A), Inc*., 858 F.2d 499, 502 (9th Cir. 1988) quoting *Volk v. D.A. Davidson & Co*., 816 F.2d 1406, 1417 (9th Cir. 1987). As articulated by the Court's December 18, 2023 Order Granting Motion to Dismiss [Dkt. 32], in order to plead fraudulent concealment to toll the running of a statute of limitations, Plaintiffs had to show: (1) when the fraud was discovered; (2) the circumstances under which it was discovered; and (3) that the plaintiff was not at fault for failing to discover it or had no actual or presumptive knowledge of fact to put him on inquiry. *Conerly v. Westinghouse Elec. Corp*., 623 F. 2d 117, 120 (9th Cir. 1980). Rosie's heightened duty of care as a fiduciary causes Defendants to fail to meet their burden on summary judgment.

### 1.    Discovery of the Fraud

Jacquelin Campos, the current Trustee of the Trust and CEO of JRE, did not discover Cintas' failure to issue royalty statements and payments to JRE until March or April 2022 (JAF 92), following Rosie's resignation as Trustee and CEO of JRE, effective January 1, 2022 (JAF 85). Prior to her discovery, neither she nor any of the Beneficiaries (or Janney) were ever informed by Rosie about royalty statements or payments to JRE by Defendants, or Defendants' contention that JRE purportedly owed Defendants money which Defendants were recouping through royalty payments otherwise due to JRE (JAF 90). There is also no evidence presented to show that Defendants themselves directly provided Janney or any of the Beneficiaries of the Trust with express notice of these issues. The only knowledge of these issues attributable to the Trust and JRE was through Rosie, as Trustee.

///

///

MOTION FOR SUMMARY JUDGMENT

2. <u>Circumstances under which the Fraud was Discovered</u>

Jacquelin Compos did not discovery Defendants' failure to issue royalty statements and to pay JRE until March or April of 2022 as she transitioned into her new role as Trustee of the Trust (JAF 85).  Specifically, Mrs. Campos discovered an accounting statement from Orchard to Cintas showing how much the Jenni Rivera catalog made for the year of 2021, but she did not find any royalty statements or payments from Cintas relating to this Orchard distribution deal (JAF 92).

Rosie's fiduciary breaches and conflicts of interest with Defendants prevented Plaintiffs from discovering the fraud earlier. As Trustee for nine years prior to Jacquelin's tenure, Rosie had fiduciary duties to the Trust and its Beneficiaries, including Jacquelin, that included "the duty of loyalty to the beneficiaries, the duty to avoid conflicts of interest, the duty to preserve trust property, the duty to make trust property productive, the duty to dispose of improper investments, and the duty to report and account." *City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 68 Cal.App.4th 445, 462 (1998).

Moreover, the Court would be remiss to not also take into account the family dynamic at the time of Jenni's death and the chain of events that followed. Jenni's children were young when she died with her eldest daughter, Janney, begin 26, and her youngest son, Juan, being 11 years of age (Resp. JAF 25), and it was reasonable for Jenni's children to assume that their aunt and grandfather were going to handle Jenni's assets responsibly through the Trust Jenni had formed prior to her death (JAF 26-28).

The terms of the Trust, and the Trust's schedule of assets, indicates that everything, in every manner whatsoever, that Jenni owned, including her rights to receive royalties and accounting under the terms of the Recording Agreements was made a part of the corpus of her Trust.  Accordingly, as Trustee, Rosie had a duty to marshal Jenni's rights under the Recording Agreements to the Trust and a duty to collect royalty payments and seek accountings of the royalty payments owed under

the terms of the Recording Agreements (Resp. JAF 75-78).  Prior to her resignation, Rosie provided the 2021 Report as an accounting of her actions as Trustee and of the transactions of the Trust. The audit was actually requested by Juan Lopez (Beneficiary) in connection with his sub-trust (JAF 79). This audit, however, did not include any accounting of royalties of Jenni's sound recordings, musical compositions, or name, image, and likeness (Resp. JAF 80, 82). By the time of the audit, Defendants had long stopped issuing royalty statements and payments to JRE (JAF 88, 89).

Other than this one accounting, Rosie did not account as Trustee at any other time, thus breaching her duty to report and account at least annually (JAF 75-78; JAE No.2, Lederman Decl., 56).  There is no accounting of any receipt to the Trust or distribution out of the Trust of royalties to the Beneficiaries during the 2021 Report's period of account (JAF 75-78; JAE No.2, Lederman Decl., 63-68).  There is, in fact, also no reference to the royalty rights in any schedule or inventory of assets found within the 2021 Report. *Id.*  The royalty payments and royalty rights are simply not accounted for in the 2021 Report. This failure to account for the royalty rights and any receipt or distribution of royalty payments owed under the terms of the Recording Agreements reflects a breach of Rosie's fiduciary duties.

Defendants argue that, during her tenure, Rosie included the Beneficiaries and Janney in decisions she made regarding Jenni's business (JAF 43), and kept them informed through a family group chat, as well as via periodic in-person meetings (JAF 44).  However, Defendants fail to specify what Jenni related business decisions Rosie kept the Beneficiaries and Janney apprised of, or what exactly they were informed about.  Indeed, if any material group texts or chats actually existed, Defendants would have surely presented them in their Motion; but they did not because none exist.  The Beneficiaries were not informed about Cintas' failure to issue royalty statements, the withholding of payment of royalties under the

Recording Agreements, or any outstanding debts that Cintas asserted were owed by Jenni (JAF 90, 91).

California courts have found that a trustee's failure to make disclosures constitutes fraud in the exercise of its equitable powers. *Estate of Sanders* 40 Cal.3d 607, 615 (1985); *Estate of Charters,* 46 Cal.2d 227, 234-235 (1956); *Jorgensen v. Jorgensen,* 32 Cal.2d 12, 18 (1948) (setting aside probate order or decree when extrinsic factors have deprived a party of a fair adversary hearing). Here, Rosie had a fiduciary duty to provide full disclosure of all material facts that affect the Beneficiaries' interests. *Hudson v. Foster*, 68 Cal.App.5th 640, 662 (2021) citing *Ball v. Posey* 176 Cal.App.3d 1209, 1214 (1986). "Even the lack of full disclosure will amount to fraud, because the fiduciary's obligation is affirmative. *Ball v. Posey* 176 Cal.App.3d 1209, 1214 (1986). It is undisputed that Rosie became the Trustee of the Estate pursuant to a Trust established by Jenni prior to her death (JAF 26, 30).

Rosie had a duty to keep, preserve, and protect Trust property. There is no indication that Rosie undertook reasonable efforts to question Cintas' assertions, or to reasonably investigate the reasons for Cintas' failure to make payments under the terms of the Recording Agreements (JAF 75-78; JAE No.2, Lederman Decl., ¶25-29). Rosie's testimony indicates that she took Cintas' assertions at face value because the source of these assertions was her father, Pedro Rivera. *Id.* These failures to investigate non-payment and pursue payment to the Trust are breaches of what were Rosie's duties to keep, preserve, and protect Trust property.

Rosie also had a duty to avoid conflicts of interest. However, her testimony indicates that she gave much deference to her father. To the extent her relationship with her father impacted her ability to effectively administer the Trust, namely, in reasonably pursuing issues surrounding Cintas' non-payment of royalties, Rosie had a conflict of interest with the Trust, which would be a separate breach of her fiduciary duties. There is also some indication that Rosie was acting as an agent of Cintas, at least during some point in time during her tenure as Trustee, given that

she had and was using a "rosie@cintasacuario" email address during her tenure as Trustee (JAF 75-78; JAE No.2, Lederman Decl., ¶30). To the extent Rosie was employed by Cintas, or acting on Cintas' behalf, as an agent of Cintas, during her tenure as Trustee, this would constitute a conflict of interest for Rosie given Cintas' contractual obligations to the Trust via the Recording Agreements. Similarly, Rosie's actions as President and CEO of Ayana, prior to, and concurrently with, the time she was the Trustee and CEO of JRE is further evidence of a clear conflict of interest and breach of fiduciary duty (JAF 75-78).

        3.     <u>There Were No Lack of Fault for Failure to Discover and No Actual or Presumptive Knowledge to Put Plaintiffs on Inquiry</u>

Defendants provide very little facts to even try to irrefutably show that Plaintiffs were on either actual or constructive notice prior to March or April 2022 (JAF 92, 93). First, any information obtained by Rosie should not be imputed on Plaintiffs given the disputed facts surrounding her clear conflict of interest with Defendants and her father, and the breach of her fiduciary duties to the Trust and the Beneficiaries. The equities associated with the tolling doctrine of fraudulent concealment should certainly lean in favor of the Plaintiffs under these circumstances.

"Normally, the trustee is the real party in interest regarding claims of the trust against third parties, and [the trustee] has the exclusive right to bring an action." *King v. Johnston,* 178 Cal.App.4th 1488, 1499-1500 (2009), citing *Saks v. Damon Raike & Co*., 7 Cal.App.4th 419, 427 (1992); *Estate of Bowles,* 169 Cal.App.4th 684, 691 (2008) ("As a general rule, the trustee is the real party in interest with standing to sue and defend on the trust's behalf."). In this case, Rosie as trustee, would have had the exclusive right to bring claims against Defendants for infringement and breach of the Recording Agreements, which she did not do. Notwithstanding the foregoing, a beneficiary of a trust may "bring an equitable action against the third party and the trustee," in situations "where the trustee should

bring the action against a third party but refuses to do so." *Johnston,* 178 Cal.App.4th at 1500.  Likewise, "a trust beneficiary can bring a proceeding against a trustee for breach of trust." *Estate of Bowles,* 169 Cal.App.4th at 691-692.  Had the Beneficiaries been informed by Rosie and known that the Trust had claims against Defendants, they could have stepped in to bring claims against Rosie and Defendants given Rosie's failure to do so.  Unfortunately, the facts in this case are clear that Rosie did not provide the Beneficiaries with adequate notice to even make such a determination, despite her duty to do so.

Applying these principles to the facts of this case, Rosie, as the former Trustee, kept the Beneficiaries of the Trust in the dark about Defendants' breaches of the Recording Agreements and claimed recoupment of overpayments made.  As such, the Beneficiaries were completely unaware of any direct claims they may have had against the Defendants stemming from those breaches and recoupment.  Moreover, the Beneficiaries were unaware of their separate claims against Rosie stemming both from her failure to bring claims against Defendants on behalf of the Trust and her own breaches of trust.  Given this outcome, it would make little sense to foreclose these same Beneficiaries from utilizing equitable tolling to stop the running of the statute of limitations on claims brought by the Trust against Defendants based upon 2013 or 2016 accrual dates triggered by events they were not informed about, and only discovered later.

Moreover, in the same vein that the naming of a successor trustee, like Jacquelin Campos, does not prevent a beneficiary from proceeding on a claim against a third party who participated in and/or benefitted from a predecessor trustee's breach of trust, like Rosie's, this Court should not impute knowledge obtained by Rosie from Defendants upon the Trust while she was Trustee because she did not disclose that knowledge to the Beneficiaries when she was obligated to do so.  "If it is true that 'the right of the beneficiaries against the [third party] is a direct right and not one that is derivative through the trustee [citation,]' "

30
MOTION FOR SUMMARY JUDGMENT

(*Atascardero*, *supra*, 68 Cal.App.4th at p. 467), we see no reason why an
independent claim that exists prior to the appointment of a successor trustee should
be extinguished upon that appointment . . . .” *King v. Johnston*, 178
Cal.App.4th 1488, 1502. (2009).  The court in *Johnston* correctly did not allow the
fraudulent conduct of the first trustee to be imputed onto the successor trustee to cut-
off the beneficiary’s claims.  *Id.*

Second, the facts relied upon by Defendants to support a showing of
constructive notice to Plaintiffs are superficial at best.  For example, Defendants
contend that aside from Rosie, JRE had three full-time employees who initially
stayed on with JRE following Jenni’s death prior to resigning (JAF 39-40).  The fact
that JRE had employees other than Rosie is non-dispositive.  Nothing is said as to
what access these employees had, if any, to any meaningful information that would
have put JRE on notice of claims against Defendants.  Defendants further contend
that Rosie used the same business manager as Jenni to help run JRE and JRF (JAF
41), and at the recommendation of Jenni’s estate planning attorneys, the corporate
form of JRE was modified (JAF 42).  Furthermore, Rosie included the Beneficiaries
and Janney in decisions she made regarding Jenni’s business (JAF 43), and kept
them informed through a family group chat, as well as periodic in-person meetings
(JAF 44).  Nothing is said as to the substance of these decisions or what information
was provided.  To the extent Defendants are inferring that Rosie informed the
Beneficiaries and Janney about JRE owing Defendants money or that Defendants
failed to provide royalty statements or payments to JRE, the Beneficiaries and
Janney expressly dispute this contention (JAF 90).  Moreover, Rosie does not recall
ever texting the Beneficiaries about royalty statements (JAF 91).

Lastly, Defendants try to draw a link between JRE and Jacquelin prior to her
taking over as Trustee and CEO of JRE in 2022.  Defendants contend that Jacquelin
took over Jenni’s charity, Jenni Rivera Love Foundation (JAF 47); and took on the
formal position of Secretary of JRE (JAF 48), giving her access to JRE’s bank

account, authority to sign checks, and access to Rosie by way of a desk that was next to Rosie's (JAF 49, 50, 51).  These "facts" are meaningless to show any constructive notice to Plaintiffs unless supported by additional undisputed facts to show that Jacquelin's access to JRE's bank account or the Jenni Rivera Love Foundation, or having a desk next to Rosie, would have in any way provided any reasonable notice to Jacquelin of Plaintiffs' claims.  They certainly do not rise to the level of irrefutable evidence needed to grant this motion.  Just because Rosie may have confided in Jacquelin regarding different aspects of JRE's business does not mean that Rosie actually told her that Defendants were recouping funds they contended were owed by JRE, or that Defendants were no longer providing JRE with royalty statements or payments.

The requirement of diligence is only meaningful when facts exist that would excite the inquiry of a reasonable person.  *Volk v. D.A. Davidson Co.*, 816 F.2d 1406, 1416 (9th Cir. 1987) (where investors received annual report that should have alerted them to fraud, no due diligence when they subsequently failed to investigate).  If, in this case, the Report and Account of Trustee of the Dolores J. Rivera Living Trust, issued on October 14, 2021 (JAF 81), and subsequent resignation of Rosie as Trustee effective January 1, 2022 (JAF 85) is analogous to the annual report in *Volk* (i.e., facts that would excite the inquiry of a reasonable person), then the earliest Plaintiffs would have been on "inquiry notice" was when the Trust Report was issued on October 14, 2021.  Defendants contend that the Audit Report did not reveal any irregularities regarding any assets of the Trust, however, it did not consider any royalties or payments of money derived from the commercial exploitation of Jenni Rivera's sound recordings and musical compositions at all (Resp. JAF 84).  As such, any inquiry notice supplied by the Audit Report is notice created by a lack of information concerning royalties and payments.

MOTION FOR SUMMARY JUDGMENT

"[I]t bears emphasis that the date of inquiry notice is not a filing deadline. It is only the date which a cause of action accrues" and the relevant two to four year limitations periods at issue in this case would begin to run. *GO Computer, Inc. v. Microsoft Corp*., 508 F.3d 170, 179 (4th Cir. 2007). Applied in this case, Plaintiffs' filing of the initial complaint in this matter on September 23, 2023, preserves all claims even if inquiry notice is established on October 14, 2021, prior to actual notice in March or April 2022 (JAF 92).

4.    <u>The Guidance Provided by Prior Rulings on Fraudulent Concealment Shows That Plaintiffs Had No Reasonable Notice</u>

Cases refusing to toll the statute of limitations for fraudulent concealment have required more than what Defendants have proffered to find as a matter of law that sufficient facts were available to put the plaintiff on notice of his or her claims. *Conmar Corp. v. Mitsui & Co. (U.S.A), Inc*., 858 F.2d 499, 503. (9th Cir. 1988).

In *Volk*, the court found that investors who received an annual report and a letter detailing the limited partnership's investments could not toll the statute of limitations for fraud, because the documents made it clear that they had paid more for their investment that it was worth. *Id*. at 1417. In this case, there is a complete an utter lack of any documentation received by JRE from Defendants as royalty statements or payments, and no documentation received by the Trust or its Beneficiaries aside from the Audit Report, as requested by Juan, can be relied upon to try to show notice to Plaintiffs of their claims.

In *Rutledge*, a claim of fraudulent concealment similarly failed where the plaintiff had litigated similar issues in an earlier case and had expressed suspicions about the defendant's wrongdoing. *Rutledge v. Boston Woven Hose & Rubber Co*., 576 F.2d 248, 250 (9th Cir. 1978). Here, although JRE, through Rosie, could have initiated litigation against Defendants, Rosie refused to do so, in dereliction of her fiduciary duties. Her obvious conflict of interest with her father, and breaches of fiduciary duties owed to the Trust and the Beneficiaries, prevented her from doing

so.  Thus, these Plaintiffs should not be foreclosed from bringing these claims as
there has been no prior litigation to tip them off to anything suspicious.

**C.    The Contractual Limitations Periods In The Recording
Agreements Are Not Dispositive of Plaintiffs' Claims**

The parties do not dispute that Defendants had a contractual obligation to
remit quarterly royalty statements (under the 1993 Agreement), and to maintain
books of account concerning the sale, distribution, and exploitation of records
(under the 1995 and 1996 Agreements) (JAF15-17).  Despite these undisputed
contractual obligations, Defendants have not identified a single fact to establish that
Defendants ever complied with these contractual obligations by actually providing
JRE with royalty statements, quarterly or otherwise, regarding any sale, distribution
or exploitation of music recorded by Jenni under the Recording Agreements.

As it relates to the express limitations period memorialized within each
Recording Agreement (JAF 18-20), no facts (or documents) have been presented to
show that Defendants actually tendered any royalty statements to Plaintiffs.  In fact,
Defendants only provide this Court with two documents – CINTAS000307-308 – as
evidence of any accounting by Defendants to JRE whatsoever (JAF ¶78).  These
statements from a third party, however, lack foundation and are inadmissible
hearsay.  *See Joint Appendix of Objections*, Nos. 3-4. Without statements being
provided by Defendants to JRE, none of the contractual limitations periods are
triggered, and Defendants' argument fails.

Defendants try to save face by foreshadowing Plaintiffs' response to this
obvious shortcoming by trying to characterize "Avalos' reporting to JRE of what
Defendants received and what JRE was owed" as a royalty statement.  This face-
saving attempt itself equates to the admitted disputed fact concerning this issue.
However, as admitted by Defendants, this "reporting" is certainly not as robust as
may typically be expected in the music industry and is certainly insufficient for this
Court to hold that these untriggered contractual limitations periods have any impact

1    on Plaintiffs' claims whatsoever.  Moreover, Defendants admit that in 2015 or 2016
2    no royalty statements were prepared or issued relating to Jenni Rivera.  (Joint Brief
3    9:9-11).

4        **D.**    **Defendants Provide Insufficient Undisputed Facts for this Court to**
5            **Extinguish Plaintiffs' Claims on their Laches Affirmative Defense**

6          Implicit within the affirmative defense of laches is knowledge of a claim.  As
7    articulated by the Ninth Circuit in a trademark infringement case, "the defense [of
8    laches] embodies the principle that a plaintiff cannot sit on the knowledge that
9    another company is using its trademark, and then later come forward and seek to
10   enforce its rights."  *Grupo Gigante S.A. De C.V. v. Dallo & Co.*, 391 F.3d 1088,
11   1102-03 (9th Cir. 2004).  This principle is grounded in the fact that laches penalizes
12   inexcusable dilatory behavior; if the plaintiff legitimately was unaware of the
13   defendant's conduct, laches is no bar to suit.  *Jarrow Formulas, Inc. v. Nutrition*
14   *Now, Inc.*, 304 F.3d 829, 838 (9th Cir. 2002) citing *Halstead v. Grinnan*, 152 U.S.
15   412, 417 (1894)("There must, of course, have been knowledge on he part of the
16   plaintiff of the existence of the rights, for there can be no laches in failing to assert
17   rights of which a party is wholly ignorant, and whose existence he had not reason to
18   apprehend."); *City of Davis v. Coleman*, 521 F.2d 661, 677 (9th Cir. 1975)("An
19   indispensable element of lack of diligence is knowledge, or reason to know, of the
20   legal right, assertion of which is 'delayed.'").

21         The limitations period for laches starts when the plaintiff "knew or should
22   have known about its potential cause of action."  *Tillamook Country Smoker, Inc. v.*
23   *Tillamook County Creamery Association*, 465 F.3d 1102, 1108 (9th Cir. 2006).
24   Defendants correctly set forth the two-fold test for laches to apply:  First, was the
25   plaintiff's delay in bringing suit unreasonable?    Second, was the defendant
26   prejudiced by the delay?  *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d
27   829, 838 (9th Cir. 2002); *Tillamook Country Smoker, Inc. v. Tillamook County*
28   *Creamery Association*, 465 F.3d 1102, 1108 (9th Cir. 2006).  As to both elements,

Defendants fail to provide this Court with undisputed facts sufficient to answer both questions in the affirmative.

First, as argued above, Plaintiffs did not have actual or constructive knowledge of their claims against Defendants until 2022 when Jacqueline Campos become the new trustee and discovered an accounting statement from Orchard to Cintas showing how much the Jenni Rivera catalog made for the year of 2021 (JAF 92). Mrs. Campos did not find any royalty statements or payments from Cintas relating to this Orchard distribution deal, thus putting her on notice of a potential breach by Defendants (JAF 93). Even if this Court were to find that issuance of the Audit Report in response to Juan Lopez's audit request should have triggered Plaintiffs' suspicions, the Audit Report was issued in October 2021 (JAF ¶81). In light of the applicable statutes of limitation in connection with Plaintiffs' claims, and the September 2023 Complaint filing date, none of Plaintiffs' claims would be time barred on statute of limitations grounds using the earlier Audit Report as an accrual date. "If plaintiff filed within [the applicable limitations period], there is a strong presumption against laches." *Tillamook Country Smoker, Inc. v. Tillamook Cty. Creamery Ass'n*, 465 F.3d 1102, 1108 (9th Cir. 2006). Furthermore, given the relatively short duration of time between Plaintiffs' actual or constructive notice of their claims and the filing of their lawsuit against Defendants, unreasonable delay should not be found. This conclusion is buttressed by the circumstances surrounding the prior Trustee's failure to give notice of potential claims to the Beneficiaries in breach of her fiduciary duties as Trustee.

Second, Defendants fail to present the Court with any evidence of prejudice whatsoever. "Laches will not apply unless [Defendants] will suffer prejudice from [Plaintiffs] delay if the suit were to proceed." *Jarrow Formulas, Inc. v. Nutrition Now, Inc*., 304 F.3d 829, 839 (9th Cir. 2002). As to prejudice, Defendants merely argue that they were reasonable in their belief that the halting of royalty payments until the purported overpayment to JRE was recouped was permissible. What is

unclear is how they would be "severely prejudiced if Plaintiffs were able to reverse all of that prior history now and use this case as a pretext to divest Defendants of their ownership of valuable rights acquired via validly executed Recording Agreements." (Joint Brief 14:22-25). The failure to articulate any prejudice aside from potential rescission of the Recording Agreements is fatal to the laches affirmative

defense to all claims.

Defendants have also not set forth any facts that they contend are undisputed regarding whether the conduct giving rise to Plaintiffs' claims against them have stopped. For example, if Defendants are still commercially exploiting musical compositions in connection with albums or songs recorded by Jenni under the Record Agreements, or selling merchandise bearing Jenni's NIL outside the scope of what was permissible to promote those albums or songs, then discrete claims for copyright and trademark infringement continue to accrue. As related to copyright infringement, each time an infringing work is reproduced or distributed, the infringer commits a new wrong. Each wrong gives rise to a discrete "claim" that "accrue[s]" at the time the wrong occurs. In short, each infringing act starts a new limitations period. *Petrella v. Metro-Goldwyn-Mayer, Inc*. 572 U.S. 663, 671 (2014) citing *Stone v. Williams*, 970 F.2d 1043, 1049 (C.A.2 1992)("Each act of infringement is a distinct harm giving rise to an independent claim for relief."). No fact has been provided by Defendants to claim that the conduct giving rise to Plaintiffs' claims has actually stopped.

Likewise, no purported undisputed fact has been presented by Defendants as to their continued failure to tender royalty statements and payments to Plaintiffs in connection with monies received in connection with albums and/or songs recorded under the Recording Agreements. Summary judgment is entirely improper when the moving parties have presented no facts to give this Court an answer to this fundamental question.

**E.**    **Defendants Have Failed to Negate any Specific Element of Plaintiffs' Claims or the Remedy of Recission**

1.    Copyright Infringement

Defendants contended that the first cause of action for copyright infringement fails because Plaintiffs cannot show that they own all of the copyrighted works, or that any of such works were infringed.   Genuine disputes of material fact exist concerning the scope of what is protected by Defendants' copyrights to albums and songs recorded by Jenni under the Recording Agreements (separate and distinct from the musical compositions to the recorded songs), and the scope of infringement by Defendants of copyrights owned by Plaintiffs.

As to the first argument, it is undisputed that Defendants had rights to albums and songs recorded by Jenni under the Recording Agreements (JAF 9-11), but the parties disagree as to the scope of rights afforded to Defendants by virtue of their copyrights to Jenni's recorded songs.   Plaintiffs contend that those rights were limited to the copyrights to the sound recordings themselves and not the musical compositions. By virtue of the Recording Agreements, Defendants had no rights to the musical composition of any Jenni Rivera songs (Resp. JAF 9-11).

As to the second argument, Plaintiffs are in the unenviable position of being asked to provide evidence of infringement without having been provided with any royalty statements from Defendants to evidence which works are being exploited commercially.   Indeed, Defendants admit they stopped preparing such royalty statements as early as 2014(JAF 88).

Notwithstanding the foregoing, it is undisputed that Defendants continue to the present to commercially exploit the recordings of Jenni Rivera and continue to derive income from their distribution of the same (JAF 94)   Cintas cannot dispute that it has a current license with Orchard Music allowing it to distribute Jenni Rivera recordings (JAF ¶95), and that Defendants received an accounting report from Orchard Music showing sales of Jenni Rivera recordings from 2012 through 2022 of

$4,436,305.82 (JAF ¶96).  Aside from the fact that Plaintiffs did not receive 50% of this income (*i.e.* the breach of contract claim), Defendants have been unable to articulate whether the revenue it has generated its wholly attributable to their exploitation of Jenni sound recordings produced pursuant to the Recording Agreements or whether it also includes the exploitation of Jenni musical compositions, the rights to which Defendants do not own.  Given this uncertainly, summary judgment is inappropriate on Plaintiffs copyright infringement claim.

> 2.    <u>Trademark Infringement</u>

Summary judgment is "generally disfavored" in trademark infringement cases due to their "intensely factual nature."  *McCall v. Andrus*, 628 F.2d 1185, 1189 (9th Cir. 1980).  The Court should apply the same standard here when the Recording Agreements afforded Defendants with only limited rights to exploit Jenni's name, image, and signatures consisting of the following registered trademarks (JAF 12-14; Request for Judicial Notice):

| Trademark | Reg. Number | Goods and Services |
|---|---|---|
| Jenni Rivera | Serial No. 90859989 (pending) | Apparel, namely, tops, shirts, pants, and hats. |
| Jenni Rivera | Serial No. 9085977 (pending) | Audio and video recordings featuring musical entertainment; digital media, namely, downloadable audio files and downloadable audio and video recordings featuring musical entertainment; downloadable musical sound recordings; downloadable video recordings featuring musical entertainment; musical sound recordings; musical video recordings; video recordings featuring musical entertainment. |
| Jenni Rivera | 5190776 | Alcoholic beverages, namely, tequila. |

| Forever by Jenni Rivera | 4623483 | Fragrances; Perfume; [ Cosmetics; ] Skin care products, namely, lotions. |
|---|---|---|
|  | 4499577 | Athletic apparel, namely, shirts, pants, jackets, footwear, hats and caps, [athletic uniforms] ; Babies' pants; Baby bottoms; Baby tops; Children's and infant's apparel, namely, jumpers,<br>overall sleepwear, pajamas, rompers and one-piece garments; ] Jeans; T-shirts for women, youths [, children,<br>and babies |
|  | 4499404 | Entertainment services in the nature of film, live and televised performances featuring musical, dance, dramatic, and comedic presentations; entertainment services, namely, an ongoing series featuring music and dance provided through the internet, television, satellite, and audio media; film, theater, radio, videotape and television program production services; entertainment in the nature of a continuing television drama series, entertainment in the nature of a continuing television comedy series; entertainment in the nature of television news shows; music publishing services; song writing services; audio recording and production; record and music production; recording studio services; magazine publication services; providing recreational activities facilities for others; recreational camps; recreational park services; amusement parks; art exhibitions; dance instruction; entertainment services, namely, operating a museum and providing guided tours of the museum; providing theme park services; dance events; dance schools; dance studios; museums; entertainment services, namely, providing podcasts in the field of music; entertainment services, namely, providing information and commentary online in the field of music; providing newsletters in the field of music via e-mail; entertainment services, namely, providing pre-recorded music, video and graphics, providing information in the field of music, and commentary and articles about music, all on-line; providing an Internet website portal featuring musical performances, musical |

40
MOTION FOR SUMMARY JUDGMENT

| | | |
|---|---|---|
| | | videos, film clips, photographs and other multimedia materials; fan club services; educational services, namely, conducting classes, seminars, conferences, and workshops in the field of music and entertainment performances |
|  | 4717069 | Athletic apparel, namely, shoes, shirts, sweaters, sweatshirts, jump suits, track suits, sweat pants, shorts, bathing suits, beach wear, belts, blazers, blouses, body suits, boots, bras, brassieres, caps, pants, coats, denim jeans, dresses, fleece tops, flip flops, footwear, gloves, gowns, halter tops, hats, headbands, hosiery, jackets, jeans, jerseys, jogging suits, jumpers, knee highs, leg warmers, leggings, lingerie, mittens, neckwear, negligees, pajamas, panties, pants, pantyhose, polo shirts, ponchos, pullovers, rain wear, jackets, robes, sandals, scarves, shirts, shoes, skirts, shorts, sports bras, bras, stockings, suits, swim and bathing trunks, tank tops, teddies, T-shirts, warm up suits, girdles, baby and infant apparel, namely, tops, T-shirts, bottoms, one-piece play suits, shoes, socks. |

Defendants, however, can only use these trademarks in the commercial marketing of the sound recordings, meaning "to promote, market, advertise and sell the artist's record and for the so-called institutional advertising for the benefit of the record company.  Institutional advertising may for example consist of record company ads or the record company's website informing the public that the artist is a recording artist for the record company or congratulating the artist on achieving certain sales or awards." (JAF 12-14, Owen Declaration, JAE No. 1, ¶15). However, a genuine dispute of material fact exists as to the scope of Defendants' contractual rights to use Jenni's registered trademarks relating to endorsements, commercial, and merchandising (JAF 12-14, Owen Declaration, JAE No. 1, ¶16-18).

Plaintiffs have a separate ownership of registered trademark rights to certain "JENNI RIVERA" related names, signatures and slogans.  These trademark rights have been infringed by Defendants through use of Jenni's name and signature

41

beyond the scope of what was afforded to them under the terms of the Recording Agreements through sponsorships, endorsements, commercials, and merchandising going beyond promotion of sales of the song recordings themselves (JAF 12-14). Defendants' continuing unlimited use of Jenni Rivera's NIL is a triable disputed fact that defeats summary judgment.

### 3.    Breach of Contract

Defendants do not dispute the fact that the Recording Agreements contain provisions requiring them to issue royalty statements to JRE, and to make royalty payments (JAF 9-11, 15-17). Defendants are in breach of the Recording Agreements on account of their failure to issue royalty statements to JRE, and their failure to make any royalty payments beginning as early as 2014 (JAF 88).    Defendants' argument that royalty statements were issued until 2016, and that their subsequent failure to provide such statements was not a breach due to JRE's agreed modification of their payment obligations is unavailing.    Even if, *arguendo*, JRE did owe Defendants a refund on prior royalty payments made, Defendants would still be obligated under the terms of the Recording Agreement to issue royalty statements showing the funds coming in and being applied to said overpayment amount which they failed to do.

In addition, Defendants argue without supporting facts that "Jenni's revised payment arrangement with UMG also resulted in her direct of royalty statements." (Joint Brief 16:11-13). Since becoming the trustee in late 2021, Defendant Campos has investigated and search for the receipts, checks, ledgers, and journals relating to all royalty payments from Cintas, Ayana, and/or UMG, and she has found no records of the alleged payments of $50,120.90, $10,555.70, or $8,811.78 in any form (Resp. JAF 69)   On summary judgment, Defendants have failed to provide the irrefutable evidence necessary to establish the lack of viability of Plaintiffs' breach of contract claim.

///

4.      Cal. Bus. & Prof. Code § 17200

Defendants link the success or defeat on summary judgment of the §17200 fourth cause of action to Plaintiffs' copyright infringement, trademark infringement, and/or name, image, likeness claims.  Because Defendants' Motion fails as to the first, second, and fifth causes of action, so does their Motion fail as to the fourth cause of action.

5.      Cal. Civ. Code § 3344.1

Similar to the trademark infringement claim analysis, the parties do not dispute the fact that the Recording Agreements afforded Defendants with limited rights to exploit Jenni's likeness or other identifying characteristics, name, signature, voice, sound effects, and biographical materials for the promotion of sale of records (JAF ¶12-14).  However, a genuine dispute of material fact exists as to the scope of Defendants contractual right to use Jenni related NIL, and Defendants exploitation of Jenni related NIL outside the permissible scope of the Recording Agreements.

6.      Fraudulent Concealment

Defendants contend that Plaintiffs have no evidence of fraud.   To the contrary, Rosie's failure to abide by her duty to make disclosures to the Beneficiaries amounts to fraud.  As articulated above, California courts have found that a trustee's failure to make disclosures constitutes fraud in the exercise of its equitable powers. *Estate of Sanders* 40 Cal.3d 607, 615 (1985); *Estate of Charters,* 46 Cal.2d 227, 234-235 (1956); *Jorgensen v. Jorgensen,* 32 Cal.2d 12, 18 (1948). Here, Rosie had a fiduciary duty to provide full disclosure of all material facts that affect the beneficiaries' interests. *Hudson v. Foster*, 68 Cal.App.5th 640, 662 (2021) citing *Ball v. Posey* 176 Cal.App.3d 1209, 1214 (1986). "Even the lack of full disclosure will amount to fraud, because the fiduciary's obligation is affirmative. *Ball v. Posey* 176 Cal.App.3d 1209, 1214 (1986).

///

43

It is undisputed that Rosie became the trustee of the Estate pursuant to a Trust established by Jenni prior to her death (JAF 26, 30).  In this capacity, Rosie failed in her fiduciaries to keep the Beneficiaries informed that Defendants have ceased preparing royalty statements, ceased issuing royalty statements, and ceased making royalty payments (JAF 88-92).  This amounts to fraud in the concealment defeating summary judgment.

### 7.    Conversion

In the FAC, Plaintiffs do link their conversion claim to the funds received by Defendants through NIL exploitation beyond the scope of what was permissible under the Recording Agreements. Plaintiffs can also link conversion by Defendants to their purported recoupment of overpayments made to JRE and for which they recouped from future royalty payments otherwise owed.  To this extent, the same grounds the defeat Defendants' Motion relating to Plaintiffs' claims for breach of contract and *California Civil Code* § 3344.1 , should also apply to deny summary judgment on the claim for conversion.

### 8.    Rescission

Defendants pin their argument against the remedy of rescission on the same delay argument forming the basis of their statute of limitations and laches affirmative defenses.  As argued, any knowledge attributable to the Trust and JRE through Rosie Rivera, as acting Trustee from 2013 through January 1, 2022, should not be imputed upon the Trust and JRE in light of her numerous fiduciary breaches and conflicts of interest with Defendants.

As to the express language within the Recording Agreements themselves, Defendants conflate termination of the agreement with rescission of the agreement. Termination contemplates an act by one of the parties to the agreement, whereas rescission is the cancellation of a contract returning the parties to the positions they would have had if the contract had not been made. *Cal. Civ. Code* §1691. Without any genuine disputed fact that Defendants stopped preparing royalty statements,

issuing royalty statements, and making royalty payments as early as 2014, and that Rosie covered up this unlawful action (JAF 88-92), Defendants have not met their burden on summary judgment on the claim of rescission.

## VII.   DEFENDANTS' CONCLUSION

Defendants respectfully request that the Court grant their Motion.

## VIII.   PLAINTIFFS' CONCLUSION

Defendants' have failed to provide uncontroverted evidence that irrefutably demonstrates that Plaintiffs discovered or should have discovered their causes of action against Defendants but failed to file a timely complaint.   In addition, Defendants have failed to negate any element of Plaintiffs' claims or the remedy of rescission. On these grounds, Defendants motion for summary judgment, or, in the alternative, summary adjudication, should be denied in its entirety.

DATED:  September 27, 2024          **ALTVIEW LAW GROUP, LLP**

By: _____/s/ John M. Begakis_____
JOHN M. BEGAKIS
*Attorneys for Defendants*
CINTAS ACUARIO, INC., a California corporation; and AYANA MUSIC, INC., a California corporation

DATED:  September 23, 2024          **CRITERION COUNSEL, LAW**

**CORPORATION**

By: __/s/ Christopher Q. Pham_____
CHRISTOPHER Q. PHAM
*Attorneys for Plaintiffs*
JENNI RIVERA ENTERPRISES, LLC, a California limited liability company; and JAQUELIN CAMPOS, an individual, in her capacity as executrix of the ESTATE OF DOLORES J. RIVERA, the successor-in-interest to the rights of Dolores J. Rivera, professionally known as Jenni Rivera

MOTION FOR SUMMARY JUDGMENT

## CERTIFICATE OF SERVICE

I hereby certify that on September 27, 2024, a copy of **DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, SUMMARY ADJUDICATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** was served by electronic mail at the address below:

Christopher Q. Pham, Esq.
Marcus F. Chaney, Esq.
CRITERION COUNSEL, LAW CORPORATION
6355 Topanga Canyon Boulevard, Suite 326
Woodland Hills, CA 91367
cpham@criterioncounsel.com
mchaney@criterioncounsel.com


Frank Salzano, Esq.
Brady Williamson, Esq.
SALZANO, ETTINGER LAMPERT & WILSON, LLP
104 West 40th Street, 14th Floor
New York, NY 10018
fsalzano@selwlaw.com
bwilliamson@selwlaw.com


September 27, 2024                          /s/ John M. Begakis
                                           JOHN M. BEGAKIS